**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **XEROX CORPORATION** | * |
| | * |
|     **Plaintiff** | * |
| | * |
| **v.** | * |
| | * |
| **PHOENIX COLOR CORPORATION** | * |
| | * |
|     **Defendant** | * |
| | *    **Civil Action No.:** L 02 CV 1734 |
| | * |

**************************************************************************

<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO PHOENIX COLOR CORP.'S</u>

<u>MOTION FOR LEAVE TO FILE COUNTERCLAIM AND</u>

<u>MOTION FOR LEAVE TO FILE AMENDED COMPLAINT</u>

Xerox Corporation ("Xerox"), Plaintiff, by and through its attorneys, Sidney S. Friedman, Rosemary E. Allulis, and Weinstock, Friedman & Friedman, P.A., hereby submits this Response in Opposition to Phoenix Color Corp.'s Motion For Leave to File Counterclaim, and Motion for Leave to File Amended Complaint, and for cause states that:

1.    The instant lawsuit was filed on May 20, 2002, and was served upon Defendant Phoenix Color Corporation on or about June 5, 2002.

2.    Following Defendant's Motion to Dismiss, and Plaintiff's Opposition, Plaintiff filed an Amended Complaint on July 9, 2002.

3.    Defendant filed a Motion to Dismiss Amended Complaint on August 1, 2002.

4.    Defendant's Answer to Amended Complaint was filed on November 12, 2002.

5.    Despite Defendant's claims in its Status Report and Memorandum, that it had

1

no knowledge of the lease transactions at issue in the present action, this is a mischaracterization of the record.

6.      Additionally, Defendant's claim that it just discovered two weeks ago that Xerox's claims against it were the result of fraud, is totally unfounded and is not supported by the record.

7.      Defendant's portrayal of the transactions between Xerox and Phoenix Color as fraudulent acts committed by a Xerox employee are bald assertions, untrue, and defamatory.

8.      Unsupported mischaracterizations of the record and libelous statements, are not sufficient to warrant leave to file a counterclaim this far into litigation.

9.      This is not a situation in which a counterclaim has matured after Defendant filed its Answer; this is an eleventh-hour attempt by Defendant to misconstrue the record in order to prolong this action, and cause additional and unnecessary expense for Plaintiff.

10.     Through its reasonable investigation, Plaintiff has discovered that the record supports additional counts as to both Defendants for claims of fraud and negligent misrepresentation.

WHEREFORE, Xerox Corporation, Plaintiff, requests this Honorable Court to:

A.      Deny Defendant Phoenix Corporation's Motion For Leave to File
        Counterclaim.

2

B.    Grant Plaintiff Xerox Corporation's Motion For Leave to File Amended

Complaint, adding counts for both fraud and negligent misrepresentation.

Respectfully Submitted,


_____WEINSTOCK, FRIEDMAN
& FRIEDMAN, P.A.


_____
Sidney S. Friedman


_____
Rosemary E. Allulis

Attorneys for Plaintiff

Executive Centre
4 Reservoir Circle
Baltimore, Maryland 21208-7301
(410) 559-9000

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **XEROX CORPORATION** | * |
| | * |
|     **Plaintiff** | * |
| | * |
| **v.** | * |
| | * |
| **PHOENIX COLOR CORPORATION**, *et al* | * |
| | * |
|     **Defendants** | * |
| | *    **Civil Action No.:** L 02 CV 1734 |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**ORDER**</u>

Upon consideration of Defendant's Motion For Leave to File Counterclaim, and Plaintiff's Response in Opposition, it is this _____ day of _____, 2003, hereby

**ORDERED**: That Defendant's Motion For Leave to File Counterclaim is **DENIED**; and it is further

**ORDERED**: That Plaintiff Xerox Corporation's Motion For Leave to File Amended Complaint, adding counts for both fraud and negligent misrepresentation is **GRANTED**.

_____
Date

_____
Judge,

United States District Court

for the District of Maryland

cc:

Sidney S. Friedman
Weinstock, Friedman & Friedman, P.A.
Executive Centre
4 Reservoir Circle
Baltimore, Maryland 21208-7301

John R. Wellschlager
Robert A. Gaumont
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, Maryland 21209

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **XEROX CORPORATION** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **PHOENIX COLOR CORPORATION** | * | |
| | * | |
| **Defendant** | * | |
| | * | **Civil Action No.:** L 02 CV 1734 |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO PHOENIX COLOR CORP.'S MOTIONS FOR: (i) LEAVE TO DESIGNATE HANDWRITING EXPERT AND EXTEND DISCOVERY DEADLINE, AND (ii) LEAVE TO FILE COUNTERCLAIM**

Xerox Corporation ("Xerox"), Plaintiff, by and through its attorneys, Sidney S. Friedman, Rosemary E. Allulis, and Weinstock, Friedman & Friedman, P.A., hereby submits this Memorandum in Support of its Response in Opposition to Defendant's two motions: Phoenix Color Corp.'s Motion for Leave to Designate Handwriting Expert and Extend Discovery Deadline and Phoenix Color's Motion for Leave to File Counterclaim.

## I.  INTRODUCTION

On March 10, 2003, the date that discovery was due to close, and following a discovery dispute that arose during a deposition earlier that day, Defendant filed a Status Report, and the Motions which are the subject of this response. *See,* Plaintiff's Exhibit 1: Deposition of Francis L. Tobin at 5-7, 126-28.  At the outset, Plaintiff takes exception to the

1

baseless and defamatory statements made by Defendant in its Status Report, specifically, under the heading "Factual Background".  First, Defendant correctly states that Jim Burkey sent an email on October 8, 1999, regarding the Technigraphix account.  Incorrectly, however, Defendant claims that the "only condition" upon which future Technigraphix contracts would be accepted is if Xerox obtained a corporate guaranty from Phoenix Color.  *See,* Defendant's Status Report at 2, ¶ 2.  This statement is a misrepresentation of this email, and of the deposition testimony of Mr. Burkey.  What the email actually states is, that the pending Technigraphix orders could only be approved "...if we have them re-written in the name of Phoenix Color Corp OR we have a signed Corporate Guaranty...."  *See,* Plaintiff's Exhibit 2: Email from Jim T. Burkey, dated Friday, October 8, 1999 at 11:35am; Plaintiff's Exhibit 3: Deposition of James T. Burkey at 30 (14-21); 31 (1-6).

It is irrelevant whether Xerox ever attempted to obtain the corporate guaranty, because through its internal policy decision-making process, Xerox could have either had the contracts re-written in the name of Phoenix Color or obtained the guaranty.  *Id.  See also,* Defendant's Status Report at 2, ¶ 2.  Mr. Nussbaum did, in fact, have the contracts re-written in the name of Phoenix Color, and with Donald Tyler's knowledge and approval.  *See,* Plaintiff's Exhibit 4: Affidavit of Bruce Mark Nussbaum at ¶ 15; Plaintiff's Exhibit 5: Representative sample of the Xerox lease modifications signed by Donald Tyler on behalf of Phoenix Color, dated December 10, 1999; Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 98-114.

Defendant bases its entire argument on unsupported contentions and mere speculation, that "...on the same day [as the email] Mr. Nussbaum committed fraud...Mr. Nussbaum then forged the initials...."  *See,* Defendant's Status Report at 2, ¶ 3.  Nothing in the record supports

2

this statement. While Mr. Tyler did testify that he did not place his initials on the contracts dated September 27, 1999; he could not testify as to who did insert these initials if they were, in fact, not his. *See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 118 (20-21); 119 (1-13). Most significantly, however, Mr. Tyler admits being presented with the contracts that are the subject of this suit, and executing them. *See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 97-114. Each and every time Mr. Tyler is presented with one of the contracts that is the subject of this suit, he identifies his signature on the contract. *Id.* It should also be noted that the contracts dated September 27, 1999, referenced by the Defendant, are not at issue in the present litigation. These contracts were superseded by the lease modifications executed by Donald Tyler during December 1999, and are therefore, irrelevant and immaterial. Moreover, pursuant to the terms of the December 1999 lease modifications, all prior contracts are superseded.

Defendant next contends that subsequent to October 8, 1999, "Xerox never informed Phoenix Color or Technigraphix that Xerox had changed the customer name or that it had rejected Technigraphix's credit...Mr. Tyler had no authority to bind Phoenix Color to a contract; he was an employee and officer of Technigraphix only." *See,* Defendant's Status Report at 2, ¶ 4. There are several problems with these statements. First, several paragraphs prior, Defendants note that "Technigraphix...had a history of late and compromised payments." *Id.* at 2, ¶ 2; Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 143 (1-16). Xerox's subsequent rejection of additional credit should not have been unexpected. Furthermore, after Xerox made the decision not to extend future credit to Technigraphix, Xerox also made the decision to only process pending orders if they were either re-written in

3

the name of Phoenix Color, or if they obtained a corporate guaranty from Phoenix Color. *See,* Plaintiff's Exhibit 2: Email from Jim T. Burkey, dated Friday, October 8, 1999 at 11:35am; Plaintiff's Exhibit 3: Deposition of James T. Burkey at 30 (14-21); 31 (1-6). This information was relayed from Xerox by Bruce Nussbaum, who communicated it to his contact person, Donald Tyler. *See,* Plaintiff's Exhibit 4: Affidavit of Bruce Mark Nussbaum at ¶ 15.

The subsequent orders that were accepted by Xerox, were actually lease modifications of then-existing Technigraphix contracts. There was concern by both parties, that the monthly payments to Xerox had significantly increased, and Technigraphix was unable to make these payments. Plaintiff's Exhibit 10: Deposition of Armando Garcia, III at 20 (1-21). This was also confirmed by Ed Lieberman of Phoenix Color during his deposition. A proposal was implemented through the lease modifications, whereby credit could be extended, the monthly payments could be lowered, and an additional piece of equipment could be added. *See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 78 (3-10), 146 (2-7); Plaintiff's Exhibit 4: Affidavit of Bruce M. Nussbaum at ¶ 14. In fact, it was Donald Tyler who induced Xerox into entering into the December 1999 modification agreements, for the purpose of lowering the monthly payments. *See*, Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 144 (1-16).

Xerox and Technigraphix had a business relationship going back almost a decade prior to the transactions that are the subject of the instant lawsuit. In February 1999, Phoenix Color acquired Technigraphix. Up until that point, Bruce Nussbaum's contact with Technigraphix was its President, Jack Tiner. *See,* Plaintiff's Exhibit 4: Affidavit of Bruce Mark Nussbaum at ¶ 4. After Phoenix Color acquired Technigraphix, Nussbaum's contact became Donald Tyler.

4

*Id.* at ¶ 5.  From the beginning, Donald Tyler held himself out to Mr. Nussbaum, as well as other Xerox employees, as a Vice President of Phoenix Color Corporation.  *Id.* at ¶ 6; *See also,* Plaintiff's Exhibit 10: Deposition of Armando Garcia, III at 31 (1-21), 32 (1-21); Plaintiff's Exhibit 11: Deposition of Patricia Elizondo at 36 (6-21), 39 (2-18), 40 (7-15). Among other things, Donald Tyler personally distributed his business card to Nussbaum, as well as other Xerox employees, which identified him as a Vice President of Phoenix Color Corporation; Jack Tiner, President of Technigraphix, advised Xerox employees that Donald Tyler was now the decision-maker, and the person whom they should go to.  *Id.*  The fact is, that Donald Tyler held himself out to be a Vice President of Phoenix Color Corporation, and he freely executed the December 1999 lease modifications as the Vice President of Phoenix Color Corporation.  "Apparent authority" has nothing to do with Mr. Tyler's actions.

## II. THE LEASE MODIFICATIONS SUPERSEDED THE ORIGINAL CONTRACTS

It is well-settled law that Maryland follows the objective theory of contract interpretation.  *Federal Leasing Inc. v. Amperif Corp.,* 840 F.Supp. 1068, 1073 (D.Md.1993). When construing the terms of a disputed contract, and where its language is "clear and unambiguous on its face," a court will confine its examination to the contract itself.  *See, Id.* (*citing, General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 262, 492 A.2d 1306, 1310 (1985)).  A court "must presume that the parties meant what they expressed."  *Id.*  As such, the terms contained within the four corners of the contract will not succumb to "...what the parties thought that the agreement meant or intended it to mean."  *Id.*  (*Citing, Board of Trustees v. Sherman,* 280 Md. 373, 380, 373 A.2d 626, 629 (1977).

Additionally, the term "supersede" means to "obliterate, set aside, annul, replace,

make void, inefficacious or useless, repeal...." BLACKS LAW DICTIONARY 1437 (6th Ed.1990).
There can be but one interpretation of this word. By the plain meaning of the language
contained within the lease modifications, therefore, the prior contracts between Xerox and
Technigraphix became null and void, and were replaced when the lease modifications were
executed in December 1999. *See,* Plaintiff's Exhibit 12: Xerox contract; Paragraph 18, terms
and conditions included in the lease modifications. in accordance with an objective theory of
contract interpretation, it must be presumed that the parties intended to be bound by the
modifications, and not the original contracts. Therefore, each time that Defendant attempts to
raise issues regarding these prior contracts, under an objective theory of contract
interpretation, the prior contracts are irrelevant and immaterial.

### III.  DEFENDANT'S MOTION FOR LEAVE TO DESIGNATE A HANDWRITING EXPERT SHOULD BE DENIED

### 1. A Handwriting Expert Will Not Assist The Trier Of Fact

A handwriting expert is not warranted, and will add nothing to assist the trier of fact
during trial of this matter. Defendant gives two reasons to support its request to designate a
handwriting expert. First, Defendant seems to claim that a handwriting expert can be used to
prove that Xerox obtained Phoenix Color's name on the lease modifications through fraud.
*See,* Defendant's Memorandum at 2, ¶ 3. Second, Defendant believes that a handwriting
expert would assist the trier of fact in determining whether Mr. Tyler had "apparent authority"
to bind Phoenix Color to a contract. *Id.* Both of these arguments are absurd.

The only contracts at issue in the instant litigation are the December 1999 lease
modifications. After these agreements were executed, all prior contracts between the parties

became null and void.  Through his own sworn testimony, the record clearly reflects that Donald Tyler did execute each of the December 1999 agreements, and identifies his signature on each of the documents.  *See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 97-114.  There is no question that Mr. Nussbaum filled in the order terms on the pre-printed Xerox contracts; he testified that he would fill in as many terms as he could, and then the customer would execute the agreement.  *See*, Plaintiff's Exhibit 7: Deposition of Bruce M. Nussbaum at 100-112.  Mr. Nussbaum testified that Mr. Tyler signed the lease modifications that are the subject of this lawsuit.  *Id.*  Mr. Nussbaum further testified that 98% of the order terms would be completed prior to presenting the document to the customer for signature, and qualified this by explaining that he never asked a customer to sign a blank document.  *See*, Plaintiff's Exhibit 7: Deposition of Bruce M. Nussbaum at 92 (1-17), 142 (18-21), 143 (1-21), 144 (1-8); Plaintiff's Exhibit 4: Affidavit of Bruce M. Nussbaum at ¶ 12.

Because Mr. Nussbaum has already testified that he pre-printed/inserted the order terms on these documents, there is nothing additional that a handwriting expert could add.  Defendant raises the disputed issue with respect to the initials "DT" that appears on a contract, and which Donald Tyler testified that he did not write.  As already noted, the contract with these initials is not even the subject of this lawsuit.  Whether or not the initials were written by Donald Tyler is therefore, irrelevant and immaterial.

## 2. Xerox Reasonably Relied Upon Donald Tyler's Actual or Implied Authority To Bind Phoenix Color When He Executed The Contracts At Issue

Defendant claims that a handwriting expert will serve as rebuttal testimony to Xerox's claim that Phoenix Color should be bound under an "apparent authority" theory.  *See,*

7

Defendant's Memorandum at 3, ¶ 2.  In support, Defendant states that when Mr. Tyler "was given the opportunity" to hand write his title on Xerox contracts, he used the proper title of "Technigraphix Division Director", but when Mr. Nussbaum wrote in Mr. Tyler's title, he inserted "V.P. Phoenix Color".  *Id.*  Even through its own assertions, there can be nothing more that a handwriting expert could add to this.  As discussed above, Mr. Nussbaum has already testified that, as a time-saving function, he pre-printed in order terms on the Xerox forms.  It is also clear from deposition testimony, that Mr. Tyler executed these documents.  It is nonsensical to think a handwriting expert is necessary to testify as to a fact that the witnesses themselves intend to testify.  Additionally, although Defendant characterizes the one time that Mr. Tyler admits hand writing his title on the Xerox form as the proper title of Division Director, it should be noted, that this is not what Mr. Tyler actually did write.  What Mr. Tyler did write, was "VP - Division Director".  *See,* Plaintiff's Exhibit 8: Xerox contract dated 3/10/99.  Again, the March 10, 1999 contract is not even at issue, as it is not one of the contracts that Xerox is suing upon, and is therefore, irrelevant and immaterial.

### A.  Donald Tyler Held Himself Out to Xerox Employees as a Vice President of Phoenix Color Corporation

As already noted above, Xerox and Technigraphix had a business relationship going back almost a decade prior to the transactions that are the subject of the instant lawsuit.  In February 1999, Phoenix Color acquired Technigraphix.  Up until that point, Bruce Nussbaum's contact with Technigraphix was its President, Jack Tiner.  *See,* Plaintiff's Exhibit 4: Affidavit of Bruce Mark Nussbaum at ¶ 4.  After Phoenix Color acquired Technigraphix, Nussbaum's contact became Donald Tyler, who was described as the "decision-maker" by

Jack Tiner. *Id.* at ¶ 5; *see also,* Plaintiff's Exhibit 11: Deposition of Patricia Elizondo at 36

(15-21), 37 (1-10), 40 (7-15).  Moreover, from the beginning, Donald Tyler held himself out

to Mr. Nussbaum, as well as other Xerox employees, as the "decision-maker", and as the Vice

President of Phoenix Color Corporation. *Id.* at ¶ 6; Plaintiff's Exhibit 10: Deposition of

Armando Garcia, III at 31 (1-21), 32 (1-21); Plaintiff's Exhibit 11: Deposition of Patricia

Elizondo at 36 (6-21), 39 (2-18), 40 (7-15).  Donald Tyler personally distributed his business

card to Nussbaum, as well as other Xerox employees, which identified him as a Vice

President of Phoenix Color Corporation. *Id.*; *See also*, Plaintiff's Exhibit 9: Copy of Donald

Tyler's Business Card.  When asked, Mr. Tyler "cannot recall" ever having any business cards

printed up in the name of Technigraphix.  *See*, Plaintiff's Exhibit 6: Deposition of Donald C.

Tyler at 84 (15-21), 85 (1-16).  The fact is, that Donald Tyler knowingly and voluntarily held

himself out to be a Vice President of Phoenix Color Corporation, and he freely executed the

December 1999 lease modifications as the Vice President of Phoenix Color Corporation.

"Apparent authority" has nothing to do with Mr. Tyler's actions.

    "The basic laws of agency state that the act of an agent or officer of a corporation is

the act of the corporation itself and that the corporation is placed on notice of all acts done by

its officers and agents in furtherance of its affairs." *See, Silver Spring Development Corp. v.*

*Guertler,* 257 Md. 291, 297, 262 A.2d 749, 753 (1970).  A corporate officer's authority may

be actual or apparent, and actual authority may be express or implied. *See, Tricat Industries,*

*Inc. v. Harper,* 131 Md.App. 89, 106,  748 A.2d 48, 57 (2000).  "A corporate officer has

implied authority to enter into...contracts without formal authorization by the board of

directors if they are within the scope of the corporate purposes." *Id.*  Such was the case when

9

Mr. Tyler held himself out as the Vice President of Phoenix Color, and executed the lease modifications in that capacity. Mr. Tyler's act was the act of Phoenix Color. Apparent authority, however, "results from a principal's manifestation of an agent's authority to a third party, regardless of the actual understanding between the principal and agent." *See, Auvil v. Grafton Homes, Inc.,* 92 F.3d 226, 230 (4[th]Cir.1996). The present case is inapposite. Xerox employees relied upon Tyler's representations, and had no reason to question his authority. They were introduced to Mr. Tyler as the decision-maker and Vice President, and reasonably relied upon that accordingly.

### III.   DEFENDANT'S MOTION FOR LEAVE TO FILE A COUNTERCLAIM SHOULD BE DENIED

### 1. Nothing In The Record Supports A Claim For Fraud Or Negligent Misrepresentation On The Part Of Xerox

After Phoenix Color acquired Technigraphix, and Technigraphix moved from Sterling, Virginia, to Hagerstown, Maryland, there was little distinction, if any, between Technigraphix and Phoenix Color. Donald Tyler continued to be Bruce Nussbaum's contact, but at no time did Mr. Tyler distribute a new business card to him, with a title other than Vice President of Phoenix Color. *See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 84 (15-21), 85 (1-16). When Mr. Nussbaum met with Mr. Tyler in Hagerstown, the meetings took place in the Phoenix Color building. In fact, the sign on the exterior of the building identified it as "Phoenix Color". *See,* Plaintiff's Exhibit 4: Affidavit of Bruce M. Nussbaum at ¶ 7. Likewise, when Mr. Nussbaum presented Mr. Tyler with the contracts, the meetings were conducted, and the contracts were executed, in the Phoenix Color building. *Id.* at ¶ 8. The Xerox equipment that was relocated from the Technigraphix location in Sterling, Virginia,

was completed in the Phoenix Color building. *Id.* at ¶ 9.

At some point, it became apparent to both Xerox and Phoenix Color/Technigraphix, that there was a problem with the payments corresponding to the original lease agreements. It is undisputed by the parties, that Technigraphix was failing to make timely payments. From Xerox's perspective, it needed to protect its interests, and made the decision to discontinue extending further credit to Technigraphix. Similarly, Edward Lieberman, who was the CFO of Phoenix Color became concerned with the amount of monthly payments on these leases, which he confirmed at his deposition. Xerox prepared a proposal that was designed to lower the monthly payments on the equipment, while adding an additional piece of equipment to the overall order. Through Mr. Tyler's admission, he believed he "enticed" Xerox into entering into this agreement, by agreeing to try the new equipment, the Docucolor 100. *See,* Plaintiff's Exhibit 6, Deposition of Donald C. Tyler at 143 (17-21), 144 (1-16). This proposal is what then became the series of lease modifications that were executed by Donald Tyler in December 1999. *See,* Plaintiff's Exhibit 4: Affidavit of Bruce M. Nussbaum at ¶ 14. In conjunction with these modifications, Mr. Nussbaum informed Mr. Tyler that these leases would need to be written in the name of Phoenix Color in order to get them through the credit approval process. *Id.* at ¶ 15. As he testified at his deposition, Mr. Tyler did execute each of these agreements. *See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 98-114. Mr. Nussbaum also attended two meetings with Mr. Lieberman, the subject of which was to discuss possible ways to catch up the payments for the Xerox equipment that had been originally leased by Technigraphix. *See,* Plaintiff's Exhibit 4: Affidavit of Bruce M. Nussbaum at ¶ 11. During these meetings, at no time did Ed Lieberman ever complain about

the leases being in the name of Phoenix Color. *Id.* at ¶ 10. Additionally, during his deposition, Mr. Lieberman testified that the only portions of the contracts that he was concerned about was the bottom line, the lowered monthly payments.

Xerox relied upon Mr. Tyler's authority as the Vice President of Phoenix Color - which is how he held himself out to Xerox - when it entered into the lease modifications in the name of Phoenix Color. As the contact person, the person designated as the decision-maker, Xerox reasonably relied upon Mr. Tyler's authority to sign these documents on behalf of Phoenix Color. As the person executing the lease modifications, Mr. Tyler had a duty to read the contents of the documents; the terms of the agreements. *See, Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 629-32, 726 A.2d 818, 831-32 (1999); *see also, Hart v. Vermont Inv. Ltd. Partnership,* 667 A.2d 578, 582 (D.C.1995)(acknowledging that, as a general rule, one who signs a contract has a duty to read it).

There has been no allegation that Mr. Nussbaum prevented Mr. Tyler from reading the agreements prior to signing them. Mr. Tyler signed them, and he signed them in his capacity as Vice President of Phoenix Color. *See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at 98-114; 88 (1-7). Through his own admissions, Mr. Tyler failed to thoroughly read the contents of the contracts, because he was only concerned with the "meat of the contract" and he cannot even recall whether the top portion of the contracts were filled in completely or not. *Id.* at 90 (1-21), 91 (1-20).

### A.  There Was No Fraud

To satisfy a claim for fraud, Defendant must prove: "(1) a representation made by a party was false; (2) its falsity was either known to the party or made with such reckless

indifference to the truth to impute knowledge; (3) the misrepresentation was made for the purpose of defrauding some other person; (4) that person reasonably acted in reliance upon the misrepresentation with full belief in its truth, and he would not have done the thing from which damage resulted had it not been made; and (5) the person so acting suffered damage directly resulting from the misrepresentation." *See, Greenfield, v. Heckenback*, 144 Md.App. 108, 127,  797 A.2d 63, 74 (2002).

There is nothing in the record to support Defendant's claim for fraud.  If anything, it was Xerox that was defrauded.  First, Xerox made no false representations.  Xerox made it clear that it was no longer willing to extend credit to Technigraphix.  Both parties had been concerned that Technigraphix owed a significant amount of money to Xerox, and was unable to keep up with its monthly payments.  On the other hand, it was Donald Tyler who held himself out as the Vice President of Phoenix Color, and as the "decision-maker".  It was Mr. Tyler who distributed his Phoenix Color business card, identifying him as a Vice President of Phoenix Color.

It was Mr. Tyler who enticed Xerox into the lease modifications in order to lower the monthly payments, and to add the new piece of equipment.  As stated in his affidavit, Bruce Nussbaum informed Donald Tyler that in order get the lease modifications through credit, they would have to be in the name of Phoenix Color.  Bruce Nussbaum printed in the terms on the order forms, and Donald Tyler freely and voluntarily signed them, as they both testified during their depositions.  Similarly, if no false representations were made by Xerox, then there can be no reasonable reliance on Defendant's part.  There is nothing in the record to indicate that blank forms were given to Mr. Tyler for his signature; as he testified, he "cannot recall".

13

*See,* Plaintiff's Exhibit 6: Deposition of Donald C. Tyler at  88 (1-7), 90 (1-21), 91 (1-20), 98-114.  Mr. Tyler certainly had the opportunity to read the contracts; he does not deny that. Assuming for the purpose of argument only, even if the contracts did have some blank terms, then why did Mr. Tyler not insist on having the terms completed prior to executing the agreements?  On the other hand, Xerox did reasonably rely upon Defendant's representations that Mr. Tyler was the decision-maker, was a Vice President of Phoenix Color, and had the authority to execute the lease modifications.  Had Xerox not reasonably relied upon these representations - all made by Defendant - then Xerox would not have suffered to its detriment by entering into this series of contracts.

### B.  There Was No Negligent Misrepresentation

To satisfy a claim for negligent misrepresentation, Defendant must establish that: (1) that Plaintiff misrepresented a present or past material fact; (2) owing defendant a duty of care, Plaintiff was negligent in making the misrepresentation; (3) that Plaintiff made the misrepresentation intending that Defendant would act in reliance on it; (4) that Plaintiff knew that Defendant probably would rely on the misrepresentation, which, if erroneous, would cause loss to the Defendant; (5) that Defendant relied on the misrepresentation; and (6) that Defendant's reliance was justified.  *See, Atkinson Warehousing and Distribution, Inc. v. Ecolab, Inc.,* 115 F.Supp.2d 544, 547 (D.Md.2000).

There is nothing in the record to support Defendant's claim for negligent misrepresentation.  For the same reasons as specified above, if anything, it was Defendant which negligently misrepresented itself to Plaintiff.  No material facts were misrepresented. At his request, in order to lower monthly payments, Mr. Tyler was presented with a series of

14

lease modifications that he was free to either accept or reject.  The record establishes that Mr.

Tyler accepted the terms of these contracts by freely and voluntarily executing them.  Again,

Mr. Nussbaum relied upon Mr. Tyler's representations to him and other Xerox employees,

that he was the decision-maker, he was a Vice President of Phoenix Color, and he was

authorized to execute the contracts.  It was Mr. Nussbaum who relied upon Mr. Tyler's

representations when he filled in the terms on the order forms, listing Mr. Tyler's position as

Vice President of Phoenix Color.  Mr. Tyler did not object to this; he signed the documents.

Mr. Tyler testified during his deposition that he really was not concerned with anything but

the equipment and the payments.

    Under these circumstances, there was no fraud or negligent misrepresentation on the

part of Xerox.  There is nothing in the record to establish that anyone from Xerox forged Mr.

Tyler's initials.  Additionally, and as already noted, the contracts that Defendant points to are

not even at issue in the present lawsuit and are therefore, irrelevant.  More significantly,

Donald Tyler held himself out as the person with the authority to bind Phoenix Color to these

lease modifications, and executed them in his capacity as Vice President.   The record does

not support either of Defendant's contentions.  If anything, it was Donald Tyler who either

negligently misrepresented, or fraudulently held himself out as the Vice President of Phoenix

Color, having the authority to sign lease modifications on behalf of Phoenix Color, and did so

in order to induce Xerox into continuing business with a failing enterprise. If any company

was defrauded, it was Xerox, which has suffered a loss of approximately three million dollars

in conjunction with these transactions.  Given that the record does, in fact, support Xerox's

claims for fraud and negligent misrepresentation, Xerox requests leave to file an Amended

Complaint, adding counts for both fraud and negligent misrepresentation as to Defendants Phoenix Color Corporation, and Technigraphix.

## IV.  DEFENDANT'S MOTION TO EXTEND DISCOVERY SHOULD BE DENIED

Xerox filed the instant lawsuit on May 20, 2002.  It was served upon Defendant Phoenix Color Corporation on or about June 5, 2002.  This Court issued its Scheduling Order on October 31, 2002, noting the discovery deadline as March 10, 2003.  Defendant was put on notice regarding the subject-matter of this lawsuit when the original complaint was filed with attachments showing the account between the two companies.  Defendant has already used well beyond its agreed-upon fifteen hours to depose five or six fact witnesses.  The testimony of each has been essentially the same; that Donald Tyler held himself out as the decision-maker, and Vice President of Phoenix Color, and that the existing contracts between Technigraphix and Xerox were modified through a series of contracts executed by Donald Tyler in December 1999.  Bruce Nussbaum testified that he pre-printed in the order terms on the lease modifications, and that Donald Tyler executed them.  It should be noted that Xerox is currently compiling a binder which will separate each contract at issue, its terms, the invoices, and the amounts currently due and owing under each one, so that this information can be more easily referenced.  There is just no other reason to continue discovery, except to delay trial of this matter, and unnecessarily cause Xerox to expend additional funds.  Xerox should not be further prejudiced by Defendant's inability to complete discovery as originally agreed-upon, especially under the guise of a futile fishing expedition.

16

## V.  CONCLUSION

For the foregoing reasons, Plaintiff requests the Court to deny each of Defendant's motions.  The contracts that Defendant portrays as being at issue, were superseded and are not even the subject of this lawsuit.  A handwriting expert is clearly not warranted, and will not assist the trier of fact.  The record does not support any allegations of fraud or negligent misrepresentation on the part of Xerox, and allowing additional time for discovery and to add a baseless counterclaim will only serve to delay trial of this matter, and cause Xerox additional and unnecessary expense.  It is now apparent, however, that the record actually supports Xerox's claims against Defendants for both fraud and negligent misrepresentation. As such, Xerox requests leave to file an Amended Complaint adding these counts.

### Points and Authorities

1. *Federal Leasing Inc. v. Amperif Corp.,* 840 F.Supp. 1068 (D.Md.1993).

B. BLACKS LAW DICTIONARY 1437 (6th Ed.1990).

C.  *Greenfield, v. Heckenback*, 144 Md.App. 108,  797 A.2d 63 (2002).

D. *Atkinson Warehousing and Distribution, Inc. v. Ecolab, Inc.,* 115 F.Supp.2d 544 (D.Md.2000).

E. *Silver Spring Development Corp. v. Guertler,* 257 Md. 291, 262 A.2d 749 (1970).

F. *Tricat Industries, Inc. v. Harper,* 131 Md.App. 89, 748 A.2d 48 (2000).

G. *Auvil v. Grafton Homes, Inc.,* 92 F.3d 226 (4thCir.1996).

## Exhibits

1.  Deposition of Francis L. Tobin.

2.  Jim T. Burkey, email dated October 8, 1999.

3.  Deposition of James T. Burkey.

4.  Affidavit of Bruce Mark Nussbaum.

5.  Xerox lease modification dated December 10, 1999.

6.  Deposition of Donald C. Tyler.

7.  Deposition of Bruce M. Nussbaum.

8.  Xerox contract dated March 10, 1999.

9.  Copy of Donald Tyler's business card.

10. Deposition of Armando Garcia, III.

11. Deposition of Patricia Elizondo.

12. Xerox lease modification, Terms and Conditions.

Respectfully Submitted,

WEINSTOCK, FRIEDMAN
& FRIEDMAN, P.A.

Sidney S. Friedman

Rosemary E. Allulis
Attorneys for Plaintiff
Executive Centre
4 Reservoir Circle
Baltimore, Maryland 21208-7301
(410) 559-9000

18