# EXHIBIT F

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| XEROX CORPORATION | : |
| Plaintiff | : |
| Vs. | : CIVIL ACTION NO. |
| PHOENIX COLOR CORPORATION | : L 02CV 1734 |
| and | : |
| TECHNIGRAPHIX, INCORPORATED | : |
| Defendants | : |

Deposition of **JAMES T. BURKEY**, taken on Monday, March 3, 2003, at 11:00 a.m., at the law offices of Piper Rudnick, LLP, 6225 Smith Avenue, Baltimore, Maryland, before Bonnie L. Russo, Notary Public.

-------------------------

Reported by:

Bonnie L. Russo

name of customer. These are considered credit files. They are considered confidential files.

Q. Okay. Do you know if this particular file was filed under the name of a particular customer?

A. There were two files. One under the name of Technigraphix and one under the name Phoenix Color Corp.

Q. Do you know which one this is?

A. I believe it's Phoenix. It is probably intermingled.

Q. Take a look at the second page of the right corner and I ask whether you can identify what file this is?

A. It's Technigraphix.

Q. And how are you basing that on? What are you basing that on?

A. In fact, it says, "Do not confuse with Technigraphix."

Q. Let's look at the third page. Looking at right now what is identified as an October 8,

1999 e-mail from you to Denise Holmes, do you recall sending this e-mail?

A. I would have to say yes.

Q. The e-mail references a telephone conversation.

Do you recall this telephone conversation?

A. Not really. This conversation was in October of '99.

Q. Sure. Do you recall whether you had a conversation with Ms. Holmes about this subject matter?

A. I'm sure I did.

Q. There are a number of people on this e-mail strip. Who is Temenia Baxter?

A. Was the finance center manager in Dallas operations.

Q. Why would she need to be on that e-mail?

A. Because that is evidently where the order or lease, whatever was being considered was sent.

A. I can't really give you a good answer on that.

Q. Why did you ask for them to be rewritten?

A. Because they are -- obviously I had knowledge that it was Technigraphix that was the customer and that their credit was not sufficient. Only Phoenix Color Corp was.

Q. So as of October 8, 1999 Technigraphix was the customer, right?

A. Phoenix Color Corp was the customer. That's what was credit approved in this document.

Q. How about the day before this document? What was your understanding as to who the customer was?

A. My understanding there were orders in-house. They must have been written in the name of Technigraphix.

Q. Okay. And you told them they needed to rewrite them in the name of Phoenix Color Corp?

A. Or corporate guarantee provided by

MR. FRIEDMAN: Ask your question again or read it back if you want.

BY MR. GAUMONT:

Q. Do you have an opinion as to whether in accordance with Xerox's credit policies, as they existed at the time of this e-mail, whether Xerox could hold Phoenix Color Corp liable for contracts executed in the name of Technigraphix when there was no corporate guarantee for Phoenix Color?

MR. FRIEDMAN: Objection.

BY MR. GAUMONT:

Q. You can answer.

THE WITNESS: It is my opinion Xerox could not hold Phoenix Color liable if there was no Phoenix Color involvement.

BY MR. GAUMONT:

Q. And by involvement what do you mean by involvement?

A. No guarantee.

Q. Why is that?

A. It's a contract.

Q. What do you mean by it's a contract?

MR. FRIEDMAN: Objection.

THE WITNESS: It's a contract between Technigraphix and Xerox Corporation.

BY MR. GAUMONT:

Q. And do you understand Phoenix Color Corp and Technigraphix as being two distinct corporations?

A. I understand --

MR. FRIEDMAN: I object.

THE WITNESS: I understand they are two separate corporations.

BY MR. GAUMONT:

Q. And in your practice as -- I apologize. I forgot your title.

What were you, credit risk manager at this time, right?

A. I had responsibility for credit.

Q. In your practice as the individual responsible for providing credit on behalf of

It says, wrote off 864.54 K. REC period 110.6 K."

Can you tell me what this means?

A. It means the total write-off was $864,000 and what was recovered was $110,600.

Q. This was back in '98; is that right?

A. Date of this is 12-14-98.

Q. I mean if you were -- does this mean you wrote off 864,000 in bad debt and you received only 110.6 from Technigraphix; is that right?

A. That's what it says.

Q. Why did you continue doing business with them?

A. I wasn't.

Q. Was this part of your determination that you were not going to approve orders in the name of Technigraphix?

A. Yes.

Q. Skip through the next pages here.

I would like to go to the next e-mail. This is an e-mail from you to Pat Elizondo.

MR. FRIEDMAN: Could you date it, please.

MR. GAUMONT: October 28, 1998.

BY MR. GAUMONT:

Q. "If we do business with the account the requirements are as follows," and then you give requirements including a promissory note, points, a few other terms and conditions.

Again, was this because you believed that Technigraphix at this point had a poor credit history and didn't warrant more favorable conditions?

A. That's correct.

Q. Let's continue going through.

Next e-mail, June 25, 1998 from Jim Burkey to Craig Wishner.

Do you know who Craig Wishner is?

A. Yes.

Q. Who was he?

A. I believe at the time was a sales rep.

Q. Do you know if he was Bruce Nussbaum's

sales manager at the time?

A. I can't say that.

Q. He could have been a sales manager?

A. Could have been.

Q. Again, it puts -- it has various conditions, including paying off promissory notes, points, down payments and so forth.

Third paragraph says, "Customers are a chronic late payer. Customer owned Technigraphix of Georgia and Xerox wrote off $840,000. There have been numerous promissory notes to clear aging invoices."

Again, was this a factor in you not giving Technigraphix more favorable conditions?

A. That's correct.

Q. Do you know whether though after June of '98 Xerox contracted with Technigraphix in the name of Technigraphix?

A. I do not know that.

Q. Wouldn't it, however, have been processed for your approval if a sales

representative attempted to commit Xerox to a contract with Technigraphix because at that point wasn't -- didn't Technigraphix already have sufficiently bad credit that any order would have been processed through your department?

MR. FRIEDMAN: Objection.

THE WITNESS: Technigraphix wasn't -- I do not know if there were any additional orders taken. They obviously were not supposed to be taking additional orders without these requirements being met.

BY MR. GAUMONT:

Q. Why were you even allowing them to take additional orders at all?

A. I wasn't.

Q. Well, there were additional -- if they fulfilled the following requirements you would allow them to pay off -- you would allow them to take additional orders; isn't that right?

A. Yes.

Q. So you were conditionally at least

saying that Technigraphix --

A. Conditionally, yes.

Q. Why didn't you make the decision that's it? Xerox is not going to contract with Technigraphix at all?

MR. FRIEDMAN: Objection.

THE WITNESS: I don't have the right of final approval.

BY MR. GAUMONT:

Q. Did you make that recommendation to anyone?

A. I do not recall if I did.

Q. Who does have the final approval?

A. The president of the corporation.

Q. The president of the corporation personally says that Xerox had to place orders with Technigraphix?

A. No.

Q. Okay.

A. Let me repeat the question. The president of the corporation did not have

anything to do with Technigraphix in approving anything.

Q. I certainly didn't think so.

A. I wasn't saying that.

Q. I didn't think you were. But did someone else tell you that orders with Technigraphix needed to be approved?

A. No.

Q. But you made the decision that if Technigraphix met certain conditions you would approve those orders?

A. Uh-huh.

Q. Okay.

A. Yes.

Q. In reference to the reference to a promissory note could you tell me how that came about? How did it come about that Technigraphix gave promissory notes to Xerox?

A. They didn't pay their invoices.

Q. So would the promissory notes then bind anyone personally?

A. No. Just the corporation.

Q. So you received extra security from the corporation if you had a promissory note in its name?

A. I do not know the type of promissory note they signed.

Q. Finally there is -- as we get through the end of the e-mails there is a document titled Technigraphix, Inc. Balance sheet showing year to date activity.

MR. FRIEDMAN: Is that pretty far down?

MR. GAUMONT: It is.

BY MR. GAUMONT:

Q. Do you know where Xerox received this document?

A. Well, it says we received this document from Denise Holmes.

Q. Do you know where she received it from?

A. I do not.

Q. And to make this easier, count the pages