**EXHIBIT 10**



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


XEROX CORPORATION,              :

   Plaintiff            :

 Vs.                         :      CIVIL ACTION NO.

PHOENIX COLOR CORPORATION:      L-02-CV-1734

and TECHNIGRAPHIX, INC., :

   Defendants          :

    - - - - - - - - - - - - - - - - - - - -


   Deposition of **BRUCE M. NUSSBAUM**, taken

on Tuesday, February 25, 2003, at 1:07 p.m., at

the offices of Piper Rudnick, 6225 Smith Avenue,

Baltimore, Maryland, before Ilana E. Johnston,

R.P.R. and Notary Public.

    - - - - - - - - - - - - - - - - - - - -


Reported by:

Ilana E. Johnston, R.P.R.

EXHIBIT
10

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888   Fax (410) 821-4889

214

1    STATE OF MARYLAND    SS:

2         I, Ilana E. Johnston, RPR and Notary

3    Public of the State of Maryland, do hereby

4    certify that the within named, BRUCE M. NUSSBAUM,

5    personally appeared before me at the time and

6    place herein set out, and after having been duly

7    sworn by me, was interrogated by counsel.

8         I further certify that the examination

9    was recorded stenographically by me and this

10   transcript is a true record of the proceedings.

11        I further certify that the stipulations

12   contained herein were entered into by counsel in

13   my presence.

14        I further certify that I am not of

15   counsel to any of the parties, nor an employee of

16   counsel, nor related to any of the parties, nor i

17   any way interested in the outcome of this action.

18        As witness my hand and notarial seal

19   this 28th day of February, 2003.

20   My commission expires          _____

21   December 1, 2004                    Notary Public

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888  Fax (410) 821-4889

6

1    at Northrup Grumman?

2         A.   After I left Xerox I went and became a

3    sales manager at a company called Future Link in

4    Beltsville, Maryland.

5         Q.   How long did you work at Future Link?

6         A.   Oh, let's see.  I worked there for about

7    a year and a half before the company folded.

8         Q.   Okay.  Could you give me some date

9    restrictions perhaps from the time that you

10   worked at Future Link, the time you began to the

11   time that you ended?

12        A.   Restrictions?

13        Q.   The dates that you worked.

14        A.   There's nothing restricted about it.  I

15   left Xerox in roughly, I kind of remember this

16   because I came back from President's Club at

17   Xerox end of March and I started in April of

18   2000.

19        Q.   April of 2000 you began working at

20   Future Link, approximately?

21        A.   Correct, a Citrix integrator, ASB want

Q.   Since the time you left Xerox have you had any discussions with anyone at Xerox about the TechniGraphix or Phoenix Color accounts?

A.   In passing, yes.

Q.   Who did you have these discussions with?

A.   Let's see.  I've had some discussions with Ted Berghane, Craig Wishner.

Q.   I'm sorry.  Ted Berghane?

A.   B-e-r-g-h-a-n-e.  A lot of the guys on my old sales team.

Q.   What's his capacity at Xerox?

A.   He doesn't work at Xerox anymore.

Q.   Why did you discuss these old accounts with him since you left Xerox?

A.   Because when I heard that I was going to be called for a case I said do you know I'm going to be called for a case.  That's the reason, was for Phoenix Color.  Xerox didn't get paid by Phoenix Color, so it's a lawsuit.  That was the course of the discussion.

Q.   Who else?

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888  Fax (410) 821-4889

A.   Toby Tobin.

Q.   Let's go back to Tobin for a second. Did Tobin call you?

A.   Yes.

Q.   When did he call you?

A.   A couple months back.

Q.   Had you talked to him since the time that you stopped working at Xerox before he called you?

A.   Yeah.  I've run into him a couple times, little league baseball games.  I never talked about Phoenix Color.

Q.   Didn't he move out of state?

A.   I don't know.  He was out of state for a long time in Rochester, came back, and from what I understand moved out again just now, just recently.

Q.   What did Toby Tobin say about this case?

A.   Just that Xerox is finally going after Phoenix for nonpayment.

Q.   Do you remember anything more specific

other than that?

1     A.   He says you may be called, you may be

2     called.   I said no, thank you.

3     Q.   Who else?

4     A.   He asked for Jonathan Frances' phone

5     number or if I knew where Jonathan was.

6     Q.   Do you know where Jonathan is?

7     A.   He's at AT&T.

8     Q.   AT&T, where's that?

9     A.   Virginia.   I don't know exactly.

10     Q.   Do you know his phone number?

11     A.   Yeah, I probably have it.

12     Q.   Do you have it with you today?

13     A.   Yes.

14     Q.   Could you give it to me?

15     A.   703-506-5129.

16     Q.   I'm sorry.   Could you repeat that?

17     A.   703-506-5129.

18     Q.   Do you know if that's his home or work

19     number?

20     A.   Work.   That's the only number I got.

75

they could?

A.   No.

Q.   Okay.  You had a discussion with
Mr. Friedman; is that right?

A.   I talked to him and we kind of -- it got
kind of cut off.

Q.   Okay.  And just one discussion?

A.   One discussion.

Q.   When you say it got kind of cut off,
what do you mean?

A.   I was, you know, believe it or not, I do
work, and I was -- I don't know what was
happening with my account base, but I was having
a very very busy day at work, and I don't
remember what cut it off.

       And we just never hooked back up, and I
should have probably called him back, and I never
did because I think the next day or so I was
served.  And I was so happy to be served that I
just said well, I'll just tell you.

Q.   Why were you happy to be served?

A.   Credit is just one component of the order approval.

Q.   Right, right.  And then it goes a level above that; is that accurate?

A.   I don't know.  I don't know about that.

Q.   But order administration, that's Jim Burkey's department?

A.   No, he's credit as far as I understand.

Q.   Who would be order administration?

A.   I don't know now.  I have no idea.  I couldn't even tell you who it was.  I mean, you've got people that are -- there are hundreds of orders in the system.  And basically credit was one component for order approval.

Q.   Now, this document, the customer legal name, what does it say the customer legal name is?

A.   Are we talking about 2505?

Q.   That's right.

A.   It says, as you see, Phoenix Color Corp.

Q.   But the document previous 2503 says

something different, right?

A. 2503?

Q. Yes.

A. And you'll notice the big difference, don't you?

Q. What does it say?

A. One is in Sterling and one is in Hagerstown.

Q. Is that the distinction to you?

A. That is the distinction. There was -- it was not -- and it was some of that reasoning that leads me to tell you that that's why I think -- I don't recall if the TechniGraphix name lived on other than once it became a Maryland -- once it moved up to Maryland other than in some customers that they had retained. I don't know.

Q. Do you remember any discussion as to whether you should change the customer legal name from TechniGraphix, a wholly owned subsidiary of Phoenix Color, to Phoenix Color Corp.?

A. With who?

Q.  With anyone at Xerox at any time.

A.  No.  Early on, you know, TechniGraphix before it was bought by Phoenix Color --

Q.  I'm sorry.  I just asked a direct question.  Do you remember any discussions with anyone at Xerox about whether the customer legal name should be changed from TechniGraphix, a wholly owned subsidiary of the Phoenix Color, to Phoenix Color?

A.  No.

Q.  Okay.  Thank you.  Now, you can finish.  Go ahead.

A.  It doesn't matter.  I forgot what I was going to say.

Q.  Okay.

A.  I think I'm being too forthcoming.

Q.  And your understanding as to why the legal name change had everything to do with the fact that the operations moved from Virginia to Maryland; is that right?

A.  No, you asked me what the difference

was, and I told you what I thought it was.

Q. Why did you fill it out differently?

A. There was no more TechniGraphix location.

Q. Okay. Let's go to the next page, 2505.

MR. FRIEDMAN: You just did that one.

MR. GAUMONT: No, we did 2504.

Q. 2505, could you identify, other than, other than Donald Tyler's signature in the lower right corner, could you identify the handwriting that's on this page throughout the document?

A. It looks like mine. I don't know if the 95 number was written by me. I'm pretty sure it was. It might have been written by Jonathan, but I generally filled out the order agreements. You can see -- I'll show you an omission. I didn't include the negotiated contract number. I just was haphazard.

Q. Okay. But this order was for a 6180, right?

A.  No, this was a modification, it looks like.

Q.  It looks like --

A.  It replaced an original order of a 6180 to add a -- this added a stacker.  See, they wanted a special -- that's all this was.  So this took the 6180 that was there that was associated with this finance number, that's what we call effectively this 95 number, and it replaced it.

The reason it was for 59 months is that's what was left.  We made it concurrent.  So that if you're adding a $100,000 component to a 6180, it would now be a new contract that replaces the old one with an increased price for this amount of months, same 95 number.

Q.  Any understanding as to why it was for 59 months, not 60?

A.  I just told you.

Q.  Right.

A.  If you just ask questions --

Q.  Any understanding as to whether Don

Tyler requested that this term be reduced from 60 to 59?

    A.  He did not.  I'm trying to tell you what was responsible for that.  Maybe I'm being too honest.  And I think that's the problem.  I should just -- you ask the question.  I'll give you yes or no.

    The reality is this -- he added a component.  The only way to do it at Xerox, as kludgey as this sounds, is take an existing contract that's associated with this number that happens to start with 95, and they replace it, the whole new system, which has some value, for whatever months are remaining, and that becomes the contract.  And that's all this was, was when he added this stacker.

    Q.  Let's go to the next page.  This is TGI-002506.  Whose signature is in the lower right corner to the best of your knowledge?

    A.  The lower right-hand corner?

    Q.  Right.

101

A.    It looks like the same signature, Donald Tyler.

Q.    And do you know whose handwriting is throughout the document?

A.    It appears to be mine.

Q.    Including putting in the title vice-president Phoenix Color, VP Phoenix Color?

A.    Yep.

Q.    Okay.  And do you have any recollection of making this modification in December of 1999? Do you recall the circumstances surrounding it?

A.    No, but when I look at it, what comes to mind is he was adding this component right, here this listing that designated a component.

MR. FRIEDMAN:  Read it.

A.    The N gate, the A gate, the PH hub, the NSP kit 3, some type of kit.  I don't know.  And that necessitated a contract replacement/modification.  This was not a new 6180.

Q.    So as far as you're concerned, the only

thing that this contract did to the previous

contract was add these new components?

A.   And change the term, I mean, you know,

change the payment and the term.

Q.   Okay.   So it added a component, right,

and it lowered the term from 60 months to 59

months?   Did it do anything else to your

understanding when you filled out this document?

A.   As I look at it, that's what it appears

to be.

Q.   Okay.   Let's go to the next page,

2507.   Do you recognize the signature on the

lower right corner?

A.   Yes, sir.

Q.   Whose signature is that?

A.   Same, Donald Tyler.

Q.   Do you recognize the handwriting

throughout the document?

A.   Yes, I do.

Q.   Whose handwriting is that?

A.   Mine.

103

Q.   Okay.  Including the title VP Phoenix
Color, right?

A.   Yes.

Q.   Including the customer legal name
Phoenix Color Corp.; is that correct?

A.   Absolutely.

Q.   Okay.  And what is your understanding of
what this document did with respect to the
contract that it was modifying?

A.   According to the document, it says it's
a replacement/modification of a prior Xerox
agreement.  I checked it.  And the prior Xerox
agreement that it is replacing or modifying is
this number.  That's what I understand.

Q.   What is it doing that the previous
contract did not do?

A.   You're adding the stacker.  I mean, this
is the -- this is what he was doing.  He was
adding a component.

Q.   Adding a component and lowering the term
from 60 months to 59.

104

A.  It might not have been lowering it.  It starts out a 60-month contract.

Q.  Okay.

A.  It might have been 59 left.  He might have said hey, you know, I wanted to get the stackers with those, why didn't you do that. Well, you didn't tell me when we first did it.  I want the stackers.  The paperwork is necessary.

Q.  Did this contract do anything other than change the terms you just talked about?

A.  I don't believe so.

Q.  Okay.  Next page, 2508.  Whose signature in the lower right, if you can identify it?

A.  It is the same signature of Donald Tyler.

Q.  And whose handwriting is throughout that document?

A.  The lower right-hand; is that what you meant?

Q.  Yes.  And whose handwriting is throughout the document?

105

A.    It appears to be mine.

Q.    Okay.  This document is dated 12/10/99; is that right?

A.    Yep.  It looks like they're all done the same day.

Q.    Okay.  What was -- what changed with respect to this -- this is a contract modification, and what was the new term with respect to this contract?

A.    This, if I'm looking at this and I have to make an opinion, all these contracts, and they're mixed 6100s, and they're all on the same day, usually you're lengthening what's left and you're giving one group amount of months left on the contract instead of some that are coming up in 40 months and 30 months and 60 months.

Q.    Well, let's go through from 2509, and I'll just ask you to look at 2510, 11, 12, 13, 14, 15, 16, 17, all the way up to --

A.    Are they all done the same day?

Q.    -- all the way up to 19.

A.  Are they all done on the same day?

Q.  Yes.

A.  They are all different equipment.  That tells me usually, when they're done on the same day and it's all the equipment, that you're trying to get a lower payment.  This may have been a genesis from one of the Ed Lieberman meetings.  I don't recall.

Q.  And do you remember any discussions with anyone at TechniGraphix or Phoenix Color about changing the name of the contracting party with respect to these contracts?

A.  You mean to Phoenix Color?

Q.  Changing the name from TechniGraphix to Phoenix Color.

A.  No.

Q.  You recall no discussions with anyone from TechniGraphix or Phoenix Color about that.

A.  No.

Q.  Okay.  Let's go to the next page.  Oh, let me just ask you if you can look through from

174

signature on the lower right-hand corner is there

any other handwriting on this document that is

not your own?

    A.   The first page I don't see my own.

    Q.   Okay.  How about the next page?

    A.   Next where it says DocuSheeter 6180 is

mine, Bruce Nussbaum, Donald Tyler, VP Phoenix

Color.

    Q.   Is that all your handwriting?

    A.   Yes.

    Q.   Okay.

    A.   This is another one of the 6180s that I

wrote.

    Q.   Okay.  Your handwriting throughout the

whole page with the exception of Don Tyler's

signature; is that right?

    A.   Except for the printed part where it

says Phoenix Color and --

    Q.   And that's typewritten.

    A.   Right, it was generated, but they had

perfected finally some type of system that was in

1  conjunction with the pricing system that

2  automatically generated documents.  It got more

3  accurate, tedious, but accurate.

4       Q.   Looking throughout this whole document,

5  with the exception of the typewritten parts and

6  Don Tyler's signature in the lower right corner,

7  is there anyone else's handwriting other than

8  yours?

9       A.   To the best of my knowledge, I don't see

10  any other than Donald Tyler's on this group of

11  documents.

12       Q.   Other than Donald Tyler's signature in

13  the lower right corner; is that right?

14       A.   Correct.

15            (Whereupon, Nussbaum Deposition

16  Exhibit No. 35, Xerox Order Agreement, marked.)

17       Q.   Could you look at this document and

18  identify it?

19       A.   Yep.

20       Q.   What is it?

21       A.   It looks like a DocuSheeter 100, excuse

213

MR. FRIEDMAN:  Yes.

(Examination concluded -- 5:16 p.m.)

-----------------------