**EXHIBIT 2**



CAP VENTURES
600 Cordwainer Drive
Norwell, MA 02061

September 12, 2003

This is a supplemental report based upon information unavailable when I drafted my initial report on January 23, 2003. Accordingly, this supplemental report should be read in conjunction with my initial report.

Since I drafted my initial report, I have reviewed the additional motions, orders and opinions in this case, including the July 14, 2003 opinion concerning summary judgment. I have also reviewed the additional discovery produced by Xerox, including the materials concerning Xerox's training policies that Xerox produced as late as August 6, 2003. Finally, I have reviewed transcripts of depositions taken in this case particularly the deposition of Xerox's sales representative, Bruce Nussbaum, Xerox's corporate designee on credit policy, James Burkey and Xerox's corporate designee on damages and collections, Rosalia Gianola.

Based on all of these materials, as well as the materials produced previously, I can conclude to a reasonable degree of professional certainty that Xerox did not act with the standard of care accepted in the printing industry by the manner in which it obtained Phoenix's name on the December 1999 lease modifications. I can also conclude to a reasonable degree of professional certainty that Xerox's damages against Phoenix are non-existent as well.

*I. Xerox Did Not Act With Reasonable Care*

My conclusion that Xerox did not act with reasonable care in procuring the December 1999 lease modifications is based on the following facts.

    A.    <u>Nussbaum's conduct</u>

According to the July 14, 2003 opinion, the Court has found that Nussbaum "did not tell anyone at Phoenix about changing the name the name on contracts from TechniGraphix to Phoenix." Order at 6. This finding is entirely consistent with my reading of Nussbaum's deposition where Nussbaum stated that he believed that the name change from TechniGraphix to Phoenix occurred as a matter "of course" when operations moved from Virginia to Maryland. It is also consistent with his testimony that the only discussions in December 1999 concerned the price, duration and configurations associated with the contract, and the desire of Xerox to place a production digital color device.

1

Nussbaum's conduct constitutes an entirely unacceptable sales practice. In this industry, Xerox has an affirmative duty to fully inform customers of all of the terms and conditions of the contracts, especially the name of the legal party.

In this case, Xerox's sales practice is particularly egregious because in October 1999 Xerox's credit department informed Nussbaum that TechniGraphix and Phoenix were separate corporations, and that Xerox would no longer contract with TechniGraphix individually unless it was given the security of a corporate guarantee from Phoenix. I have reviewed undisputed testimony that Xerox never informed the customer that Xerox had decided to no longer contract with TechniGraphix directly without a corporate guarantee. This is an unacceptable practice in this industry.

It is also unreasonable that Xerox expected that the same individual who had bound TechniGraphix to contracts -- Tyler -- could bind Phoenix to contracts as well. In this industry, sales representatives have a duty to make inquiries concerning the scope of the authority of the individual who is signing the contracts. As of December 1999, Tyler had only signed leases on behalf of TechniGraphix and had done so since March 1999. A sales person acting reasonably and acceptably would have made some inquiry in December 1999 as to whether the same individual who had signed lease modifications on behalf of TechniGraphix could also sign contracts on behalf of Phoenix, particularly since the sales representative had been informed that contracts in the name of TechniGraphix (which Tyler had signed) had been rejected.

## B. Lease Modifications versus Negotiated Contracts

Most important, the type of form that Xerox used to purportedly bind Phoenix -- the lease modification -- is entirely unacceptable to change the customer legal name. The lease modification expressly states in the paragraph titled "REPLACEMENT/ MODIFICATION OF PRIOR XEROX AGREEMENT" that these agreements are intended to modify existing contracts between the customer and Xerox, and that the prior agreement "shall remain in effect" except for new terms, such as "price, duration, and configuration." Lease Modification ¶ 25. Further, Xerox's own training policies state that these modifications are to be used for "add-on accessories," "upgrades," "contract extensions," or "price plan changes." See Xerox training policies produced on August 6, 2003. Nowhere in Xerox's own policies does it state that sales representative can or should use a lease modification to change the identity of the customer – this is not an acceptable or reasonable practice in this industry.

Further, the paragraph titled "NEGOTIATED CONTRACT" indicates that these lease modifications are subordinate to the terms and conditions of other contracts that Xerox cannot produce and that are almost certainly in the name of TechniGraphix. Paragraph 39 states that "If the terms in this Agreement conflict with those contained in the Negotiated Contract, the terms of the Negotiated Contract shall prevail." It is accepted practice whenever new equipment is delivered or a new customer number is established

2

that a sales representative will require the customer to sign a more detailed document, a Negotiated Contract, with respect to this equipment.

Because the Negotiated Contract box is checked on all of the December 1999 lease modifications and because all of these modifications concern equipment that was already being leased by TechniGraphix, I believe that every Negotiated Contract is in the name of TechniGraphix.

This is confirmed by the fact that whenever a Negotiated Contract number was inserted it always referred to Negotiated Contracts that were in TechniGraphix's name. For example, on page 90 of Exhibit 1 to Xerox's summary judgment motion Xerox states that the lease modification refers to Negotiated Contract No. 070716806. Page 495 of Exhibit 1, however, makes clear that this Negotiated Contract preceded the December 1999 modifications, and are in TechniGraphix's name.

Based on the documents Xerox has produced, I do not believe that Xerox ever obtained a Negotiated Contract in Phoenix's name. Again, this is an unacceptable and unreasonable practice.

    C.    The Corporate Guaranty Option

If Xerox wanted to obtain a change in the customer legal name (and change the party liable for the lease obligations), there are two generally accepted practices in this industry by which Xerox could have done so. The most common and preferable is to obtain personal or corporate guaranties from the parent corporation, if additional security is requested. This option was presented by Mr. Burkey in his October 1999 e-mail and Xerox's training documents go into great detail as to how corporate guaranties can and should be obtained. The corporate guaranty is important because they are more formal documents, almost always signed by financial officers of corporations. In this case, there was no corporate guaranty and the evidence is undisputed that Xerox did not ask for one. Again, this is an unacceptable practice – the customer should have at least been given the option of negotiating for a corporate guaranty.

Alternatively, Xerox could have asked Phoenix to execute new Negotiated Contracts. This would have been unusual for Xerox because at the time of the December 1999 lease modifications, Xerox and TechniGraphix were already committed to 60 month lease obligations. To do this, Xerox would have had to cancel the existing contracts, settle existing liabilities with TechniGraphix and establish new customer numbers and potentially new terms. Companies like Xerox do not like to employ this practice and risk losing terms for which it has already bargained, and that is why the corporate guaranty is the standard practice in this industry.

    D.    Xerox's Lack of Diligence

Finally, even if Xerox had employed the proper type of contract and fully informed the customer of the change in legal name and of Xerox's decision concerning

3

TechniGraphix's credit, Xerox did not act with reasonable care in determining the scope of the authority of the person who signed the lease modifications – Donald Tyler. In my opinion, Xerox acted recklessly. In this industry, sales representatives are supposed to act with some diligence in determining whether the persons signing the contracts are corporate officers. Mr. Burkey's files actually show that Xerox possessed Dunn & Bradstreet reports for Phoenix that identifies the corporate officers. Tyler is not one of them. These Dunn & Bradstreet reports are readily available (and frequently used) by sales representatives. Also, the web site for Phoenix revealed Phoenix's corporate officers. Again, there is no mention of Tyler.

I personally have conducted sales training for representatives like Nussbaum, and there is no indication that Nussbaum or anyone else at Xerox conducted any of the diligence procedures that we discuss in identifying accounts and identifying who to sell to. For a corporation that is as public and transparent as Phoenix, it would have been very easy for Xerox to determine the authority of any individual signing the contracts. Xerox acted recklessly in procuring Tyler's signature on the December 1999 modifications.

## *II. Xerox's Damages*

I have previously opined that Xerox could have completely mitigated its losses had it acted to reclaim the equipment once it was notified that TechniGraphix ceased active operations in late September 2000. Report at 2. Since that time, Xerox has produced contracts and invoices in the form that it will be using at trial, and has filed a summary judgment motion indicating that its claimed damages are $1,966,668.00 based on the December 1999 modifications. Xerox's Motion at 2. These damage numbers are unsupportable, inaccurate and unreasonable.

I will note first that while calculating damages from lease agreements is usually a straightforward process, Xerox has made this process unnecessarily difficult by the way in which it has combined the purported obligations of two separate corporations -- Phoenix and TechniGraphix -- into single customer numbers. This would suggest to me that the individuals negotiating these lease agreements (like Mr. Nussbaum) did not understand that Phoenix and TechniGraphix were two separate corporations which, again, is unacceptable and negligent given the facts possessed by Xerox and the lack of inquiry and disclosure by Xerox.

    A.    <u>No Damages Because No Negotiated Contracts</u>

Xerox cannot find the Negotiated Contracts to which these lease modifications are subordinated. Xerox also cannot find contracts in this case that would contain important terms like fair market value and the applicable disengagement fee, although these terms can be estimated with some accuracy. The Negotiated Contracts, however, are crucial because they usually contain conditions and remedies for breach that, according to paragraph 39 of the lease modifications, control.

4

Because Xerox cannot or will not produce the Negotiated Contracts in this case, I believe that the most accurate measure of damages is for Xerox to reclaim the equipment at issue in this case. I have been informed that TechniGraphix paid Xerox for use of the equipment until September 2000 and that it informed Xerox promptly at that time that it had ceased active operations and would no longer be making payments. Because the Negotiated Contracts all bind only TechniGraphix, Xerox should have reclaimed its equipment at that time. Without the Negotiated Contracts, it is impossible for Xerox to establish damages beyond return of its equipment.

        B.    <u>Xerox Damages Under Paragraph 13 of Lease Modifications Could Have Been Avoided</u>

Because Xerox's corporate designee, Ms. Gianola stated in deposition that Xerox believes that it is entitled to damages under paragraph 13 ("Breach") of the lease modifications, I will also consider damages under that alternative theory.

Basically, paragraph 13 divides damages into three components.

First, there are outstanding payments due at the time of breach. TechniGraphix states it paid until September 2000 – the time when it informed Xerox that it ceased active operations and that Xerox should reclaim its equipment.

Second, paragraph 13 provides for payment of the remaining lease payments *on the equipment only* plus the fair market value of the equipment at the end of term. The equipment in this case consists of Docutech equipment (6180s and a 6100) with controllers, DigiPaths, docusheeters, scanners, perfect binders, high capacity stackers and interposers. This equipment has an extremely long product life cycle, particularly when, in the case of the Docutech equipment, the equipment has remained unused since September 2000. In this industry, the number of copies made (or clicks) is essential to measuring its value (not unlike the odometer of a car). I have inspected this equipment and it has very low clicks.

I have opined previously to a reasonable degree of professional certainty that Xerox could have mitigated its losses entirely had it acted promptly to mitigate its losses in September 2000, rather than allow the equipment to be stored. With respect to the issue of how much the equipment could have been resold or released compared to the purchase option/ fair market value of the equipment, it is my opinion that Xerox could have done better than the existing lease had it acted promptly to release or resell. For example, Xerox's documents indicates a purchase option of less than $160,000 for at least one 6180. See Page 138 of Xerox's Exhibit 1. I personally have been involved with the purchase of 6180 machines for more than $400,000 per configuration and I have, in the course of my job as an industry analyst, talked with former sales representatives (now consultants) who have sold 6180 configurations for far more than $400,000. I know as an industry analyst that Xerox can, at minimal cost, reconfigure a 6180 and sell it as newly remanufactured for more than $400,000. A fully configured 6180 system with a controller, high capacity stacker and roll to sheet converter can be currently sold for

5

$462,580. Just the six 6180s alone have a value of over $2.7 million. This is still state of the art equipment with tremendous value.

I have reviewed Ms. Gianola's deposition and understand that it is Xerox's position that it can force the customer to buy the leased equipment and that, as a result, it had no duty to reclaim the equipment. This is not an accepted practice in this industry. When a customer can no longer pay and has ceased active operations, leasing companies in this industry are supposed to reclaim the equipment. While this equipment has considerable value, it cannot be used by released or resold by the customer without Xerox's permission both contractually and as a practical matter. Contractually, a customer is prohibited from assigning this equipment. Practically, Docutech configurations are complicated and require maintenance and supply contracts to be operated. Xerox is in the best position to resell this equipment at the best price and thereby mitigate any loss.

Third, paragraph 13 provides for the payment of 15 percent of the total of the accelerated payments and fair market value *of the equipment only* (i.e. 15 percent of the second part described above). Depending on the version of paragraph 13, Xerox describes this as either "reasonable liquidated damages" or a "disengagement fee." They are the same concept. In cases where the lease modification version does not explicitly describe the disengagement fee as 15 percent, I know this from industry knowledge. Calculating this amount is a challenge because Xerox has not separated the equipment from the other parts of its claims (e.g. supplies and past invoices) and because Xerox does not indicate where, if anywhere, this calculation was made.

In calculating this fee, it is important to remember that, under paragraph 13(b), the fees expressly exclude "any unearned finance, maintenance and supply charges." These charges account for an extremely large percentage of the monthly minimum payments indicated on the lease modifications. These are all costs that Xerox does not incur if a customer seeks active operations (like TechniGraphix did in September 2000). Under the lease modifications, they cannot be claimed.

The notations on the bottom of page 511 of Exhibit 1 appear to be what I would describe as a typical breakdown of how much the minimum monthly payment is for equipment and how much is for other avoidable costs that cannot be claimed. Of the $20,543.43 minimum monthly payment, apparently only $4,702.43 is devoted to actual payments on the equipment. The rest of these payments are not allowed once Xerox is informed that the customer ceased operations (both because of the language of paragraph 13 and because the customer avoids incurring these charges).

In calculating damages, Xerox has inappropriately continued charging the minimum monthly payment after it was informed that TechniGraphix ceased active operations. The notebook prepared by Xerox is replete with examples of monthly minimum charges beyond September 2000, through the remainder of 2000, and even into 2001. These charges are inexcusable. But Xerox has presented them in a way that makes it difficult to divorce them from Xerox's damages claim.

6

Further, Xerox's claim includes some inexplicable estimations of the amount that can be claimed from certain equipment. For example, Xerox lists the remaining payments and fair market value of one controller (serial number R9H300012) at $227,000. This is a completely inaccurate price. This controller sells for $34,500.

Because the remaining payments and fair market value of this equipment is uncertain, I can provide a range as to the amount of the 15 percent reasonable liquidated damages under paragraph 13. Excluding the non-claimable charges and other redundancies, I estimate the accelerated payments *for the equipment only* at between $1.8 and $2.5 million. Accordingly, the maximum damages against TechniGraphix would be 15 percent of that amount, between $270,000 and $375,000. This amount represents the reasonable liquidated damages/ disengagement fee under the lease modifications, as well as the profits that Xerox would have obtained on the equipment alone. It does not include profit from maintenance, supply and finance charges, which are not allowable under paragraph 13.

This is an alternative damages amount that applies Xerox's theory (using paragraph 13 of the lease modifications). My primary view is that no party owes Xerox any money because Xerox cannot produce the Negotiated Contracts that expressly control the damages in this case and because TechniGraphix made payments and notified Xerox promptly after it ceased active operations.

Even under this alternative theory, Phoenix cannot be liable for damages. I have explained above why Xerox did not exercise reasonable care in executing the lease modifications and why the lease modifications cannot be used to change the customer legal name. It is also significant, however, that Xerox does not possess December 1999 lease modifications in Phoenix's name for *at least two* of the 6180 configurations at issue in this case. By Xerox's own records, these configurations have value in excess of $200,000 each. As explained above, they could be resold easily for in excess of $400,000 each.

If Xerox had acted to resell or release this equipment promptly in September 2000 (or even if it did so now) the amount that Xerox would have attained exceeds the amount of damages that Xerox can claim on the December 1999 modifications by applying the 15 percent figure that is generally accepted in this industry. For this reason, even if the December 1999 modifications were found as effective as changing in the customer legal name (and I do not see how they could be interpreted in that manner) and even if Xerox was found as complying with the accepted industry standard of care, Xerox has no damages against Phoenix.

**Submitted by Charles M. Corr**

*[signature]*

**Date: September 12, 2003**

7