IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

XEROX CORPORATION,

    Plaintiff,

v.

PHOENIX COLOR CORPORATION

And

TECHNIGRAPHIX, INC.,

    Defendants.

CIVIL ACTION NO. WDQ 02 CV 1734

**DEFENDANTS' OPPOSITION TO XEROX'S MOTION TO STRIKE
AND FOR PROTECTIVE ORDER**

Defendants Phoenix Color Corp. and Technigraphix, Inc. ("Defendants") respond to Xerox Corp.'s motion to strike and for a protective order.

**INTRODUCTION**

Xerox has withheld producing until after the summary judgment deadline and the close of discovery the most important documents in this case (other than the contracts themselves). These documents are internal Xerox training materials that show that sales representatives are instructed not to use lease modifications to change customer legal names and that lease modifications are to be used only "to change an agreement a customer already has with Xerox."

After Defendants' expert, Charles M. Corr, reviewed this material a supplement to his opinion was required under Federal Rule 26(e). Contrary to Xerox's motion, Mr. Corr had been disclosed not

just as a mere expert in equipment valuation and mitigation, but as an expert in "Industry Standards" – his January report included opinion on the sales and approval process, the specificity and clarity of the contractual terms, and the use of promissory notes in this industry. *See* Exhibit A, Mr. Corr's Report at p. 1 ¶¶ 1-6.[1] As disclosed in his report, Mr. Corr's expertise is not just in equipment valuation, but results from a 20 plus year history of negotiating printing agreements and dealing with major print suppliers like Xerox, first as the head of a major university's printing and publications services and then as the group director for one of the premier printing market analyst firms in the country. *Id.* at pp.7-9.

Xerox's motion is baseless – it is designed to either (i) poison the well for legitimate (and persuasive) expert testimony or (ii) cover up late-produced discovery that is fatal to Xerox's case. Xerox's motion states that they are prejudiced by this supplemental report. In reality, it is Defendants who have been prejudiced by being denied the opportunity to depose fact witnesses about this late-produced discovery and by being denied to opportunity to present this testimony (and these documents) to this Court on summary judgment. Permitting Mr. Corr to testify as to the conclusions that he has drawn in his supplemental report is not just consistent with the Federal Rules, it is also the fairest way for this Court to remedy the prejudice that Defendants have incurred.

---

[1]  The copy of Mr. Corr's report that Xerox attached as an exhibit to its memorandum does not include the page indicating Corr's signature (page 4) and the page indicating his compensation (page 6).

## ARGUMENT

A. *Federal Rule 26 Requires A Party To Supplement An Expert's Report When That Expert Has Reached New Opinions.*

Federal Rule 26(a)(2)(C) provides that expert witness disclosures shall be made at times directed by the Court and, absent such direction, must be made at least 90 days before trial. The Scheduling Order in this case set a January 23, 2003 deadline for Defendants' disclosure and Defendants complied with it in producing Mr. Corr's Report. Until it filed this motion, Xerox never once argued (even during deposition) that Mr. Corr's Report was deficient. Indeed, the only argument that Xerox makes for the deficiency of this report is that it must be deficient because that is "the only reasonable explanation" for why he supplemented it. Xerox's Motion at 2.

Federal Rule 26(a)(2)(C) also states that "[t]he parties shall supplement these disclosures when required under subdivision (e)(1)." Rule 26(e)(1) states that an expert has a duty to supplement "both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due." Rule 26(a)(3) disclosures are due 30 days before trial, but are adjusted to the time of pre-trial submissions under Local Rule 106.3 and 106.4.

Experts change and develop their opinions as they hear evidence and they sometimes develop additional opinions, even during trial. *See Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.*, 20 F.3d 15, 21-22 (1st. Cir. 1994) (expert testimony admissible despite contention that it differed from opinions raised during pretrial litigation). The Federal Rules require, however, that an expert supplement his report when he has reached new conclusions. *See Doe By And Through G..S. v. Johnson*, 52 F.3d 1448, 1463-64 (7th Cir. 1995) (expert could not opine as to future medical needs because, although the expert's

opinion on the subject was formed after deposition, she did not supplement her report to include that subject). Under Rule 26(e), this supplementation can be made by deposition testimony and does not need to be made as each additional item of information is learned, but should be made at appropriate intervals. *See Tucker v. Ohtsu Tire & Rubber Co.*, 49 F. Supp.2d 456, 460 (D. Md. 1999).

In *Tucker*, Judge Grimm considered the circumstances as to when an expert should supplement the report. *Tucker* involved a case where an expert disclosed opinions at deposition that had not been disclosed on the expert's Rule 26(a)(2)(B) report. *Id.* at 458. Defense counsel examined the expert extensively during deposition about whether he had performed any additional tests to reach these conclusions and the expert answered that he had done none. *Id.* at 459. Six months later the expert produced a supplemental report demonstrating that he had performed an additional examinations and performed the tests inquired of at deposition and they confirmed the conclusions that he had reached at deposition. Judge Grimm permitted the supplemental report, citing the supplementation requirements of Rule 26 and concluding that the circumstances did not indicate that supplementation would be "unfair" cause "undue delay," or that the party offering the supplemental report was trying to engage in "trial by ambush." *Id.* at 460-61.

B.  *The Tucker Factors Indicate That Mr. Corr Should Be Allowed to Supplement His Report.*

In *Tucker*, Judge Grimm suggested four factors that this Court should consider in deciding whether an expert supplementation should be considered:

> (1)  The explanation for making the supplemental disclosure at the time it was made;
> (2)  the importance of the supplemental information to the proposed testimony of the expert, and the expert's importance to the litigation;
> (3)  potential prejudice to an opposing party; and
> (4)  the availability of a continuance to mitigate any prejudice.

All of these factors indicate that expert supplementation in this case is appropriate.

1.  **Defendants' Explanation for Making Supplemental Disclosures Is Sound Because Corr's Supplemental Report Was Inspired By Xerox Training Documents That Were Withheld Until After The Summary Judgment Deadline.**

After reviewing training documents that Xerox produced after the summary judgment deadline, Mr. Corr developed an additional opinion of the lease modifications. Corr's Report had originally stated that the "general practice within the industry and at Xerox" was "to have all contracts reviewed internally by sales management and financing staff prior to execution." Corr's Report at 1 ¶ 3. Corr's Report noted how the lease modifications "lack[ed] the specificity generally accepted in the industry" and "were missing terms and were generally unclear as to what was covered." Corr's Report at 1 ¶ 4. He also opined that the "common industry practice [was] to request a promissory note for an agreement of this size." *Id.* ¶ 6. After reviewing the training materials, however, Corr now believes that the lease modification "is entirely unacceptable to change the customer legal name." *See* Corr's Supplemental Report at 2 ¶ 4. This is a new opinion, certainly, but it is within the scope of his original disclosure.

Attached is the most relevant portion of the late-produced training materials which show that lease modifications are not to be used to change the legal name of the customer:

---

**Replacement / Modification of Prior Xerox Agreement**

- New section - used to change an agreement a customer already has with Xerox.

- Use **MODIFICATION** for:          Use **REPLACEMENT** for:

  — Add-on Accessories                — Contract Substitutions
  — Upgrades                          — OTP Transactions
  — Contract Extensions
  — Price Plan Changes

2.   The Supplemental Information Is Central To The Issue Of This Case.

The import of this material cannot be overstated.  Xerox is claiming in this litigation that the party to existing Technigraphix contracts changed to Phoenix when Mr. Nussbaum completed (and Donald Tyler signed) a lease modification with the name Phoenix on it.  Xerox's own training policies state, however, that modifications are "used to change an agreement a *customer already has* with Xerox."  (Emphasis added).  The training documents define precisely what types of modifications a sales representative should make with a modification – "add-on accessories," "upgrades," "contract extensions," and "price plan changes."  This is consistent with all of the witnesses' testimony that these were the only conditions discussed in negotiating the December 1999 modifications.  Nowhere in the training documents does it state that a sales representative can or should use a lease modification to change the customer legal name.  Quite the opposite, the training documents expressly state that modifications are to be used to change only a pre-existing agreement between Xerox and a customer.  Accordingly, Xerox is guilty of flouting its own guidelines which shows that either (1) it did not intend to novate the existing leases with Technigraphix or (2) it did not use the care require to maintain a claim of apparent agency.  Either possibility is fatal to Xerox's case.

Tipped off by the training documents -- which makes this point in very clear, large type, bullet point fashion -- Mr. Corr reexamined the fine print of these lease modifications.  He found two paragraphs that are relevant to his new opinion that lease modifications are not to be used to change customer names.  The first, paragraph 25, states:

> REPLACEMENT/MODIFICATION OF PRIOR XEROX AGREEMENT
> – If this option has been selected, this Agreement will replace or modify a prior agreement between you and Xerox covering the specified equipment. If it is a replacement agreement, the prior agreement shall be null and void.  If it is a modification, the prior agreement shall remain in effect except that any new terms presented in this modification agreement (e.g.,

price, duration and configuration) shall take precedence over the prior terms for the balance of the Agreement.

According to this paragraph, when a lease modification is selected, the pre-existing agreement with Xerox (i.e. the agreements between Technigraphix and Xerox) "shall remain in effect." The modification only changes "term[s]" such as "price, duration and configuration." A customer legal name is not just a "term" -- it is the party who is liable under the contract. Further, any ambiguity as to whether the list of terms is exhaustive is resolved by the late-produced training documents that provide an exhaustive list of changes that can be made with the lease modification -- "add-on accessories," "upgrades," "contract extensions," and "price plan changes." Also, arguing that a lease modification could change the customer legal name would render senseless the statement that "this Agreement will replace or modify a prior agreement between you and Xerox covering the specified equipment." If lease modifications could be used to change the customer legal name, there would be no "prior agreement between you and Xerox."

The second paragraph relevant to Corr's conclusion that lease modifications cannot be used to change customer legal names is found in paragraph 39:

> NEGOTIATED CONTRACT. If this option has been selected, the agreement is subject to the terms contained in the identified Negotiated Contract. If the terms contained in this Agreement conflict with those contained in the Negotiated Contract, the terms of the Negotiated Contract shall prevail.

The Negotiated Contract box is checked on each and every one of the December 1999 lease modifications. Some of these lease modifications have a number written next to them; others just include the checked box. Based on this information, Corr now understands that there are Negotiated Contracts covering all of this equipment and that these lease modifications are subordinated to the Negotiated Contracts. Because all of this equipment was delivered through leases with Technigraphix

(almost half of the original leases were executed before the Phoenix stock purchase), Corr believes that all of these Negotiated Contracts must be in the name of Technigraphix. Xerox has not produced a single Negotiated Contract in the name of Phoenix. Thus, in case this Court finds ambiguous whether "term" under paragraph 25 can relate to a customer legal name, it should look to paragraph 39 which expressly states that the "terms of the Negotiated Contract shall prevail." In other words, the original agreements with Technigraphix trump anything written in the later lease modifications.

With respect to his report, Corr previously opined that promissory notes (or corporate guaranties) were the "common industry practice" for obtaining payment security in this industry. Corr Report p. 1 ¶ 6. Now, he opines that Xerox could have taken one of two approaches when it wanted security on the Technigraphix leases – try to obtain a corporate guaranty from Phoenix or renegotiate the underlying Negotiated Contracts. Corr Supplemental Report p. 3 ¶¶ 5-6. Corr explains the reasons why print-supply companies dislike renegotiating contracts and prefer to use the promissory note option. *Id.* This is a supplement to his original opinion, but it is within the scope of his initial report.[2]

---

[2] Mr. Corr also considered this Court's July 14, 2003 finding that Nussbaum "did not tell anyone at Phoenix about changing the name on the contracts from Technigraphix to Phoenix" and, based on this finding, found that Nussbaum's conduct did not indicate the diligence or care expected in this industry. Supplemental Report ¶ 5 (quoting July 14, 2003 Memorandum Opinion at 6). This was Nussbaum's testimony at deposition (that the negotiations with Tyler concerned only duration, components and price), but Xerox unnecessarily muddled this testimony at summary judgment by producing a sham affidavit claiming that Nussbaum discussed changing the name to Phoenix. Mr. Corr's conclusions concerning Mr. Tyler's conduct and care are new opinions, but are within the scope of his previous opinions of sales practices and were delayed by Xerox's own conduct in procuring a contradicting affidavit that this Court rejected. Mr. Corr's other observations concerning deposition testimony, documents and the damages notebook produced by Xerox with its summary judgment motion, taken by themselves, may not have warranted report supplementation.

3. <u>Xerox's Potential for Prejudice Is Limited And Self-Imposed.</u>

Xerox has argued that it was timely in responding to its discovery, including the training materials. The record reveals not only that this is untrue, but that, unfortunately, Xerox's delay in producing the training materials was possibly designed to survive a motion for summary judgment:

- On January 3, 2003 Phoenix served Xerox with its First Request for Production of Documents. (A previous document request was served on Xerox by Technigraphix on December 18, 2002.) Request No. 17 asks for "All documents instructing Xerox employees, including, but not limited to, sales representatives, about the procedure for completing and obtaining approval for the form # 51858 ("Sales Maintenance Agreement"), # 51850 ("Lease Agreement") and # 51864 ("Addendum to Create a Separate Maintenance Agreement")." *See* Exhibit B.

- On February 10, 2003 Xerox responded to Phoenix's request, objecting that it was overbroad and irrelevant, but agreeing to produce "specific pages of the USCO Contract Simplification Learner Guide for forms 51858, 51860, and 51864 Effective 1/97, how to guide on various Xerox Order Agreements," and other business and credit policies relating to sales orders. *See* Exhibit C.

- This Court set a March 10, 2003 deadline for close of discovery.

- Between February 10, 2003 and March 10, 2003 Xerox produced documents relating to its business, credit and training policies, giving the appearance that it was providing all of the documents that Phoenix requested on January 3rd and that Xerox committed to providing on February 10, 2003.

- This Court set an April 8, 2003 deadline for dispositive motions.

- On April 28, 2003 Defendants' counsel received an incomplete copy of the training materials promised in the February 10, 2003 written response. *See* Exhibit D. This material was forwarded to Mr. Corr, along with other "supplemental" documents that Xerox had produced after the discovery deadline.

- Mr. Corr reviewed this material, but could not draw conclusions from it because it was unclear to him as to what was produced. During this time, Phoenix had a summary judgment motion pending before this Court. Defendants' counsel asked counsel for Xerox to provide a complete copy of the training and sales material requested and specifically asked that this material include the page numbers that were cut off in the previous production so counsel could determine what was produced. Counsel for Xerox informed counsel for Defendants that she did not possess the training materials, but was relying on what was being provided by Xerox's offices in Florida.

- On August 6, 2003, counsel for Xerox provided what she described in her cover letter as a "legible" copy of this training materials. *See* Exhibit E.

- On September 5, 2003, counsel for Xerox sent, at Defendants' request, a complete copy of the chapter pertaining to lease negotiation. *See* Exhibit F. Xerox's cover letter to this production stated that it was being provided as a courtesy and that the prior production (i.e. the documents produced on August 6, 2003) complied with the discovery request.

Xerox's argument that it was timely with discovery and that the only supplement made after the discovery deadline concerned "pages intentionally left blank," is just wrong. Xerox's Memorandum at 8. Not one of the three productions of relevant training material occurred before the dispositive motion deadline, even though these documents were requested on January 3rd. Yet, Xerox told Defendants that

it would produce these documents on February 10th and then produced other closely-related documents. If Xerox had just stated that it refused to provide these documents until after summary judgment, Defendants could have filed a timely motion to compel before the discovery deadline.

Xerox also downplays the fact that it deposed Mr. Corr, on September 18th, after he produced his supplemental report. Xerox does not mention that it questioned Mr. Corr extensively about the opinions expressed in both his initial and supplemental report, including his qualifications to express those opinions. *See* Exhibit G, Corr deposition at pp. 4-7, 13-26. Xerox probed into exactly the type of "industry practices" -- including the appropriateness of Tyler's and Nussbaum's conduct -- that Xerox now claims are not appropriate for him to opine upon at trial. *Id.* pp. 95-123, 135-50. Although the deposition was suspended, the agreement put on the record by counsel for Xerox was that it would be continued either in person or by telephone. *Id.* p. 150-51.

Granting Xerox a rebuttal expert should not be necessary because Xerox knew back in January that Mr. Corr's expertise and opinion was much broader than damages. Corr opined as to the "general practice [of] hav[ing] all contracts reviewed internally by sales management and financing staff prior to execution." Corr Report at 1 ¶ 3. He stated that this review was "generally the practice within the industry and at Xerox." *Id.* He opined that "[t]hese contracts lack the specificity generally accepted in this industry." *Id.* ¶ 4. The contracts "were missing terms and were generally unclear as to what was covered." *Id.* ¶ 4. He also opined that the "common industry practice" was to request a promissory note, and he pointed to discovery showing that Xerox had previous requested such notes from Technigraphix. His opinion concerns sales practices and the negotiation and approval process, as well as equipment valuation.

Based upon this opinion, Xerox should have known that if it produced documents showing that sales representatives are instructed that lease modifications are "used to change an agreement a customer already has with Xerox" and are limited to such additional terms as "add-on accessories," "upgrades," "contract extensions," and "price plan changes," Mr. Corr might well develop an opinion that the lease modification cannot be used to change the customer legal name.

    4.    <u>The Availability of a Continuance to Mitigate Any Prejudice.</u>

Defendants do not seek a continuance, but will abide by any result this Court believes is appropriate. Defendants suspect, however, that Xerox has proposed this option only to pressure this Court to exclude legitimate expert testimony. This is a legitimate supplement -- "not a trial by ambush" -- and a continuance is neither necessary nor warranted.

## CONCLUSION

For these reasons, Defendants respectfully request that this Court DENY Xerox's motion to strike or for a protective order.

Respectfully submitted,

*[signature]*

John R. Wellschlager (Fed. Bar No. 24752)
Robert A. Gaumont (Fed. Bar No. 26302)
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-3000

*Attorneys for Phoenix Color Corporation, Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of October, 2003 a copy of Defendants' Opposition to Xerox's Motion to Strike or for a Protective Order was mailed, postage pre-paid, to: Sidney S. Friedman, Esquire and Rosemary E. Allulis, Weinstock, Friedman & Friedman, P.A., Executive Centre, 4 Reservoir Circle, Baltimore, Maryland 21208-7301, attorneys for plaintiff.

_____
Robert A. Gaumont