**EXHIBIT G**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

------------------------------------x
XEROX CORPORATION,

                Plaintiff,

      -against-              Civil Case No.
                                  WDQ 02 CV 1734
PHOENIX COLOR CORPORATION

and

TECHNIGRAPHIX, INC.,

                Defendants.
------------------------------------x

                September 18, 2003
                9:32 A.M.


       Deposition of CHARLES M. CORR, taken by Plaintiff, pursuant to Agreement, at the offices of Piper Rudnick, LLP, 1251 Avenue of the Americas, New York, New York 10020 before Anneliese R. Tursi, a Registered Professional Reporter and Notary Public within and for the State of New York.



**CLASSIC REPORTING, INC.**
**TOTAL LITIGATION SUPPORT**
ARTA PASCULLO, President
13 West 36th Street • New York, New York 10018
Tel: (212) 268-2590 • Fax: (212) 268-2596

```
 1                       C. Corr
 2   C H A R L E S   M.   C O R R,
 3           having been first duly sworn by the
 4        , Notary Public (Anneliese R. Tursi),
 5           having stated his business address as
 6           being CAP Ventures, 600 Cordwainer
 7           Drive, Norwell, Massachusettes 02061
 8           was examined and testified as follows:
 9                   MR. FRIEDMAN:  Why don't we have
10           the two reports as Corr Exhibit 1 and
11           2.
12                   (Letter dated January 23, 2003 on
13                   CAP Ventures letterhead with
14                   attached report by Charles M.
15                   Corr dated January 22, 2003
16                   marked Corr Exhibit 1 for
17                   identification, as of this date.)
18
19                   (Letter dated September 12, 2003
20                   from Robert Gaumont to Sidney
21                   Friedman with attached
22                   supplemental report by Charles M.
23                   Corr dated September 12, 2003
24                   marked Corr Exhibit 2 for
25                   identification, as of this date.)
```

**Page 5**

```
1              C. Corr
2   EXAMINATION BY MR. FRIEDMAN:
3       Q.  Would you state your name please,
4   for the record?
5       A.  Yes, Charles M. Corr.
6       Q.  Mr. Corr, by whom are you
7   employed?
8       A.  CAP Ventures.
9       Q.  In what capacity?
10      A.  I'm a group director.
11      Q.  Which means what?  What do you
12  do?
13      A.  I am responsible for managing a
14  number of services at CAP Ventures.  We are a
15  consulting firm and we have a number of
16  different practices.
17      Q.  We have marked as Exhibit 1 the
18  report of January 23, 2003, which you authored
19  and signed off on.  Attached to that were some
20  bio's on you and your company.
21      A.  Yes.
22      Q.  Let's look at those bio's and I
23  will ask a few questions.
24      A.  Sure.
25      Q.  I take it, Exhibit A, which is
```

**Page 6**

```
1              C. Corr
2   the bio on CAP Ventures, is a fair summary of
3   what CAP Ventures does?
4       A.  Yes.
5           MR. GAUMONT:  Objection.
6       Q.  In Exhibit A, you have a category
7   entitled "CAP Ventures Consulting expertise
8   includes the following practice areas:"
9           Do you see that?
10      A.  Yes.
11      Q.  Which of those areas relates to
12  the expertise that you are offering today?
13          MR. GAUMONT:  Objection.
14          You can answer.
15      A.  The first paragraph kind of
16  indicates, and then subsequently, one answer
17  is that all of our services work together in
18  conjunction to provide a view of markets and
19  we use all of our services to get an
20  understanding of markets.
21          So the primary service would be
22  the on-demand that is supported by others,
23  such as the digital peripheral and services
24  that look at consumable use, paper use.  So at
25  one level, they are silos of services.  On
```

**Page 7**

```
1              C. Corr
2   another level, they're complementary.
3           And the services that I have look
4   at hardware and software in both production
5   environments and in work group environments
6   like what you see here.
7           And we also then work with
8   vendors of this equivalent, the manufacturers
9   and distributors and using, companies like
10  Kinkos or Moore, who use equipment.
11          So in some ways, while they are
12  independent practices, they are complementary
13  in terms of developing expertise.
14      Q.  What is your understanding as to
15  the area of expertise that you are testifying
16  to today?
17      A.  Practices within the industry.
18      Q.  Anything else?
19      A.  That's fairly comprehensive.
20      Q.  All right.  So your expertise
21  focuses on, with regard to this lawsuit,
22  practices within the industry?
23          MR. GAUMONT:  Objection.
24      A.  Right.  As both a consultant to
25  the industry and also having been in this
```

**Page 8**

**Page 13**

```
            C. Corr
 1
 2      Q.  Would they be considered in the
 3  category of the 40 percent private
 4  consultation revenue?
 5      A.  Yes.  Yes.
 6      Q.  Let's look at Exhibit C attached
 7  to your report.
 8          Now, as I understand it from your
 9  testimony so far, the area within which you
10  are being offered as an expert is within the
11  print -- on-demand printing?
12      A.  Yes.
13      Q.  On-demand publishing and
14  printing?
15      A.  Right.
16      Q.  What within your bio, Exhibit C,
17  supports that expertise, in your opinion?
18          MR. GAUMONT:  Objection.
19      A.  Do you want me to talk about it
20  or do you want to dive into it?
21      Q.  Point out the areas.  Let's just
22  take the first page, page 7.
23          MR. GAUMONT:  If I could note for
24      the record, it is a three-page resume.
25          MR. FRIEDMAN:  Correct.  I
```

**Page 14**

```
            C. Corr
 1
 2  understand.
 3      Q.  Page 7.
 4      A.  Yes.
 5      Q.  On page 7, what information set
 6  forth on page 7 supports your area of
 7  expertise with regard to this lawsuit?
 8      A.  As you start off, I'm the group
 9  director, I'm one of the most senior people at
10  CAP Ventures, which makes me one of the more
11  senior people in the industry.  So I'm often
12  consulting with senior clients.
13          I'm a public speaker at industry
14  events on a regular occasion.  And I have been
15  doing that, as you can see, since 1998.
16      Q.  And you are saying you are one of
17  the more senior people at CAP?
18      A.  Yes.  I'm a group director.
19      Q.  By senior, are you indicating
20  seniority in terms of years or seniority in
21  terms of some sort of expertise?
22          MR. GAUMONT:  Objection.
23          You can answer.
24      A.  In terms of expertise and
25  responsibilities.
```

**Page 15**

```
            C. Corr
 1
 2          If you think about how we are
 3  organized as a professional services firm, we
 4  have the managing director, Charlie Pesko, we
 5  have group directors, group directors have
 6  directors that report to them, consultants and
 7  research analysts and other folks report to
 8  group directors.  And then I have been there
 9  since 1998.
10          Prior to being there, I have more
11  than 25 years experience in the printing,
12  copying, corporate field and implemented
13  digital print technology and, indeed, helped
14  pioneer digital print technology in the late
15  '80s and early '90s.
16          So I know the technology, I know
17  how to incorporate it into the business, and
18  then I have consulting experience since 1998.
19      Q.  Is it fair to say that the
20  paragraph on page 7 that starts with the
21  on-demand printing and publishing services,
22  would be the paragraph which would be most
23  specifically related to your expertise with
24  regard to this matter?
25          MR. GAUMONT:  Objection.
```

**Page 16**

```
            C. Corr
 1
 2      A.  Yes.  In conjunction, as we have
 3  stated earlier, with the sister services.
 4      Q.  Let's look at pages 8 and 9 of
 5  your report, Exhibit C.
 6          Point out to me anything else
 7  that you think specifically supports your
 8  expertise with regard to your testimony in
 9  this case.
10      A.  Some of what I have done, which
11  is explained in the second paragraph,
12  responsible for driving programs that help
13  service providers, distributors,
14  manufacturers, and end-users of business
15  communications technologies and services.
16  That I have worked, provided research and
17  consulting services for literally every major
18  player.
19          As I mentioned, I'm a frequent
20  speaker.
21          Additionally, prior to joining
22  CAP Ventures, I was responsible for operations
23  of Harvard University Printing and
24  Publications Services from 1984 to 1999.  They
25  were a full service graphics service provider
```

4 (Pages 13 to 16)

(212) 268-2590                                       E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.

**Page 17**

```
 1            C. Corr
 2  to Harvard University and its affiliates. We
 3  were essentially a cost recovery department
 4  within Harvard University. When I left, it
 5  had an annual sales of $14 million.
 6         While at Harvard University, as I
 7  mentioned earlier, we helped bring the market,
 8  the digital print market, into the production
 9  market.
10         So if you think about the
11  transition of the industry from offset to
12  digital, this is when it happened, in the late
13  '80s, early '90s. It continues to happen.
14         So I had a great deal of
15  experience entering into literally dozens of
16  lease and purchase agreements with Xerox and
17  other vendors during my tenure at Harvard.
18         You know, I don't know if it --
19  do you want me to go into the recognitions and
20  affiliations?
21      Q.  Sure. I would like to know what,
22  among those recognitions, you think supports
23  your expertise with regard to your testimony
24  in this case.
25         MR. GAUMONT: Objection.
```

**Page 18**

```
 1            C. Corr
 2      A.  Okay. The first one, Printing
 3  Industry of America, that talks directly to
 4  the fact that the industry was changing from
 5  offset printing to digital print.
 6         The Overture print-on-demand
 7  printing project was a development project
 8  with Xerox PARC. And the result of that is
 9  today's DigiPath. And DigiPath was an effort
10  to network devices such as a DocuTech, which
11  speaks to my understanding of both the
12  technology and the practical uses of a
13  technology within a printing establishment.
14         Then First Place Awards for most
15  creative use of digital printing and
16  reengineering, the same point, how do you use
17  this technology effectively?
18         The affiliations, I have been on
19  Xerox University Advisory Panels.
20      Q.  What is that?
21      A.  They had established a number of
22  advisory panels to help them go to market,
23  understand requirements, provide case studies,
24  provide a sounding board for product
25  development efforts, sales and marketing
```

**Page 19**

```
 1            C. Corr
 2  efforts, identifying, you know, to a certain
 3  extent, identifying applications where the
 4  technology was applicable and it helped guide
 5  both the marketing message and the product
 6  development efforts.
 7         Profit Control Users group,
 8  really, Profit is an MIS program used by
 9  primarily commercial printers to help them
10  manage their business. So it really just
11  speaks to knowing a number of people in the
12  industry.
13         The National Association of Print
14  Leadership is an industry association that I
15  have been a member of for a long -- many
16  number of years.
17         I was a member of the National
18  Association of College and University Mail
19  Services.
20         Quick Printers/Print Image, I
21  have been a member of for a long time.
22         Printing Industries of New
23  England, a long time.
24         And I have been affiliated with
25  the GCIU, which is a union, since the start of
```

**Page 20**

```
 1            C. Corr
 2  my tenure at Harvard.
 3         Some of these are just general
 4  industry associations of which I have been a
 5  member of for a long period of time, which
 6  speaks to practices and understanding the
 7  industry and knowing what's going on.
 8         I think on the technology side,
 9  we discussed a little of this, but we helped
10  develop the products that are really currently
11  at use in this case.
12         We worked with Xerox PARC and
13  Harvard Business School to develop a model for
14  print-on-demand. We used this technology to
15  provide other applications such as Harvard
16  diplomas. We developed a print-on-demand
17  printing solution for Harvard Business School
18  publishing.
19         I served as a subject matter
20  expert to Xerox to networked digital print
21  order entry, pricing and scheduling software,
22  related to that project, as well as Overture
23  and DigiPath.
24         The FAS was it was an on-line
25  tool that enabled students and faculty staff
```

5 (Pages 17 to 20)

(212) 268-2590                                    E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.

**Page 21**

```
 1              C. Corr
 2    to print and distribute in an environment in
 3    the way that if I was at a house and my local
 4    printer went down, I could access a printer
 5    next door or at the library and there was a
 6    whole payment procedure that used debit cards
 7    behind that.
 8         Q.   Does that support your testimony
 9    as an expert in this case --
10              MR. GAUMONT: Objection.
11         Q.   -- in your opinion?
12         A.   Only in that it speaks to taking
13    technology and incorporating it with a
14    business practice.
15              I have expertise on both sides of
16    that, which is kind of neat to do, but it also
17    had a component that was a business component.
18              The same with the last, pricing,
19    estimating, order entry.
20              And before I was at Harvard, I
21    was at Wellesley College, a smaller college,
22    but essentially performing the same duties
23    earlier in time. We had offset presses and
24    what are now Xerox DigiPath.
25              The other relevant, I have taught
```

**Page 22**

```
 1              C. Corr
 2    classes at Northeastern University on buying
 3    print services, selecting and purchasing
 4    paper, managing print production, which would
 5    be the most relevant.
 6         Q.   Among all the qualifications that
 7    you just mentioned as relating to the area of
 8    expertise that you are offering in this
 9    lawsuit, is there anything in there which
10    indicates an expertise in evaluating equipment
11    in the secondary market?
12              MR. GAUMONT: Objection.
13         A.   Having been in the industry, I
14    have sold equipment into the secondary market.
15    I have purchased equipment in the secondary
16    market. I have consulted with clients who
17    were considering buying equipment or selling
18    equipment into the secondary market.
19              And it is critically important
20    for us as a company to understand the dynamics
21    of these markets which is related to -- if you
22    think about a top line, we have got to
23    understand the dynamics of the costs in the
24    marketplace, the marketplace dynamics.
25              One of the things we do on an
```

**Page 23**

```
 1              C. Corr
 2    annual basis is we forecast the market by unit
 3    so it is important for us to understand, for
 4    instance, what is the market for a specific
 5    piece of device in a given year, what is its
 6    placement activity in the past, what is its
 7    activity level, how much in pages is it
 8    producing, what is the retail value of those
 9    pages. That's the basis of our ongoing
10    consulting service is that type of
11    information. So you have to be, on one level,
12    you have to be constantly following the
13    market.
14              On the other level, you have to
15    be advising clients on both the seller side
16    and the buyer side on market dynamics and
17    opportunities and then on the final areas,
18    that I bought and sold a number of pieces of
19    equipment while I was at Harvard.
20         Q.   Is there anything in your
21    background and in your listing of
22    accomplishments that focuses on the secondary
23    equipment market --
24              MR. GAUMONT: Objection.
25         Q.   -- specifically?
```

**Page 24**

```
 1              C. Corr
 2         A.   Only insofar as I have explained
 3    that I have bought and sold, I have advised
 4    clients on buying and selling. We track that
 5    market as it impacts the overall opportunity
 6    for placements of new equipment.
 7         Q.   So you do track something in the
 8    secondary market, is that what you are saying?
 9         A.   Yes.
10         Q.   Do you have forecasts for the
11    secondary market equipment?
12         A.   What we have, we have
13    forecasts -- for instance, our overall
14    forecasts look at two primary things:
15              Placements of new equipment,
16    right, now, we also have to keep track of the
17    total install base of equipment, which
18    generates, uses paper, it generates income to
19    companies like Xerox and others in terms of
20    service and supply revenue.
21              So not only do you get money from
22    selling equipment, you get money from the
23    aftermarket and, indeed, you generally get,
24    you know, that is an important part of your
25    business, and it produces retail value, which
```

6 (Pages 21 to 24)

(212) 268-2590                              E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.

Charles Corr
September 18, 2003

```
 1            C. Corr
 2   is critically important to the service
 3   providers.
 4            We have to track two things: How
 5   many new units go into the market and how many
 6   units remain in the market. And as part of
 7   the remain in the market, it is how many are
 8   put back into circulation.
 9            By that, I mean, which is part of
10   the secondary market, something comes up on a
11   lease, it was sold as new, let's track sort of
12   a device, sold as new, right, at the end,
13   let's say, of the lease term, it doesn't leave
14   the market.
15            It may leave a particular
16   location, but we need to understand what's
17   happened to that asset in the install base for
18   two reasons: What is it generating in terms
19   of pages and the subsequent revenue, and then
20   the other is what impact does the secondary
21   market have on the primary opportunities
22   selling new equipment replacements.
23       Q.   Do you have any publication which
24   specifically focuses on the sales, buying and
25   selling in the secondary market, used
```
Page 25

```
 1            C. Corr
 2   equipment?
 3            MR. GAUMONT: Objection.
 4       A.   We have no specific publication
 5   that does that. It is covered in our annual
 6   market forecasts, which is a couple of
 7   hundred-page document.
 8       Q.   I take it, therefore, that you
 9   have no specific publications which focuses on
10   the buying and selling in the secondary market
11   of the Xerox 6180s?
12            MR. GAUMONT: Objection.
13       A.   If you are asking if there is a
14   specific publication?
15       Q.   Yes.
16       A.   There is no specific publication
17   titled that it is covered in our methodology
18   and in our annual publications, particularly
19   the on-demand market forecasts.
20       Q.   Is there anything in there that
21   specifically focuses on the buying and selling
22   of Xerox 6180s?
23            MR. GAUMONT: Objection. Asked
24       and answered.
25       A.   Yes.
```
Page 26

7 (Pages 25 to 28)

Page 95

1              C. Corr
2   president?
3        A.   He had an obligation to inform
4   anyone I was doing business with as to what
5   his role was.
6        Q.   Thank you. All right.
7             Now, you have indicated that
8   there was some duty on the part of Xerox to
9   have made an inquiry to understand who they
10  were dealing with --
11       A.   Yes.
12       Q.   -- with regard to the execution
13  of these contracts.
14            Are you assuming that Xerox made
15  no inquiry?
16       A.   I'm --
17       Q.   Are you aware of any inquiries
18  that Xerox made?
19       A.   Am I aware of any inquiries to
20  Mr. Tyler, or in general?
21       Q.   Yes, or to Phoenix Color or
22  TechniGraphix regarding the position, what Mr.
23  Tyler's position was.
24       A.   What Mr. Tyler's position was?
25       Q.   Yes.

Page 96

1              C. Corr
2        A.   I -- my sense -- I don't know,
3   obviously. Obviously, I wasn't -- were there
4   any conversations? I have no knowledge of any
5   conversations.
6        Q.   So you were not advised of
7   information that was provided to Xerox when
8   Phoenix Color purchased the stock of
9   TechniGraphix in February of the year 1999?
10       A.   Right.
11       Q.   Were you aware that Phoenix
12  Color -- well, you were aware because you
13  reviewed that document?
14       A.   Yes, I was aware of it.
15       Q.   You understood from reviewing the
16  documents, that Phoenix Color purchased the
17  stock of TechniGraphix, correct?
18       A.   And that TechniGraphix was a
19  wholly owned subsidiary.
20       Q.   What does it mean to be a wholly
21  owned subsidiary?
22       A.   What does it mean to me to be a
23  wholly owned subsidiary?
24       Q.   Yes, to you.
25       A.   That it is held as a separate

24 (Pages 93 to 96)

(212) 268-2590                                        E-Mail: ClassReptg@aol.com
                        CLASSIC REPORTING, INC.

Charles Corr
September 18, 2003

### Page 97

```
                  C. Corr
 1
 2    legal entity and that, generally, there was
 3    some separation between those entities from a
 4    legal perspective.
 5       Q.   Is that always the case?
 6       A.   Is it always the case?
 7       Q.   Yes.
 8       A.   It would depend how the deal was
 9    structured. I would say it was generally the
10    case, otherwise --
11       Q.   It would depend -- I'm sorry, go
12    ahead. Otherwise?
13       A.   Otherwise, you wouldn't have
14    handled it in that manner.
15       Q.   A wholly owned subsidiary can be
16    a part of the acquiring corporation --
17          MR. GAUMONT: Objection.
18       Q.   -- is that correct?
19          MR. GAUMONT: Asking for a legal
20       conclusion.
21       A.   It is certainly not my experience
22    that that would be the case. If you
23    established it that way, my experience would
24    indicate there was a reason for it.
25       Q.   Would somebody, in order to
```

### Page 98

```
                  C. Corr
 1
 2    determine what the actual status was, would
 3    you need to obtain the -- a copy of the
 4    purchasing agreement?
 5          MR. GAUMONT: Objection. It
 6       calls for a legal conclusion.
 7       Q.   You may answer.
 8       A.   I mean, for -- for a legal
 9    certainty, yes, I would agree with you.
10       Q.   Yes?
11       A.   For business practice.
12       Q.   More into -- yes, business
13    practice?
14       A.   I would -- it is not at all
15    uncommon, when we look at businesses and
16    evaluate businesses, you look at the parent
17    company, you look at the subsidiaries and you
18    try and understand what the relationship is
19    between parents and subsidiaries.
20       Q.   As a salesman going in to
21    approach a company involved in a situation
22    where, in this case, Phoenix Color purchased
23    TechniGraphix --
24       A.   Right.
25       Q.   -- would a salesman be justified
```

### Page 99

```
                  C. Corr
 1
 2    in relying upon information conveyed to him by
 3    the officers of those corporations --
 4          MR. GAUMONT: Objection.
 5       Q.   -- as to the status?
 6          MR. GAUMONT: Objection.
 7       A.   My advice would be that you do
 8    your own due diligence.
 9       Q.   How would you do that?
10       A.   Dun & Bradstreet reports, website
11    reports. There are numerous ways that one can
12    obtain who is who and what's what.
13       Q.   Is Dun & Bradstreet always an
14    up-to-date report, in your experience?
15          MR. GAUMONT: Objection.
16       A.   One can obtain accurate
17    up-to-date information from Dun & Bradstreet.
18       Q.   Was it a fact that Dun &
19    Bradstreet gets the information from the
20    corporate officers of those companies they are
21    reporting?
22          MR. GAUMONT: Objection.
23       A.   Not always.
24       Q.   They speak to the corporate
25    officers and ask them and make inquiries in
```

### Page 100

```
                  C. Corr
 1
 2    order to prepare their report?
 3       A.   Generally.
 4          MR. GAUMONT: Objection.
 5       Foundation.
 6       Q.   Isn't that what a salesman would
 7    do, speak to the corporate officers; isn't
 8    that a normal business practice?
 9          MR. GAUMONT: Objection. Asked
10       and answered.
11       Q.   You may answer.
12       A.   Yes.
13       Q.   In March of 1999, shortly after
14    the purchase of TechniGraphix by Phoenix
15    Color, Patricia Elizondo of Xerox, who was
16    vice president Maryland, Virginia sales CBU at
17    that time, which would be the area involved
18    covering TechniGraphix and Phoenix Color, had
19    a conversation with Jack Tiner concerning the
20    purchase of TechniGraphix by Phoenix Color.
21          Do you know who Jack Tiner was?
22       A.   Yes.
23       Q.   Who was he?
24       A.   The principal at TechniGraphix.
25       Q.   By the principal, you mean the
```

(212) 268-2590

E-Mail: ClassReptg@aol.com

CLASSIC REPORTING, INC.

**Page 101**

C. Corr

1 man in charge --
2 A. Yes.
3 Q. -- or the equivalent of a
4 president?
5 MR. GAUMONT: Objection.
6 A. I don't recall his title.
7 Q. I don't either, but the man in
8 charge?
9 MR. GAUMONT: Objection.
10 A. For lack of a better
11 characterization, I will agree to that.
12 Q. Ms. Elizondo testified at her
13 deposition that Mr. Tiner phoned her at that
14 time to advise that Phoenix Color had
15 purchased TechniGraphix stock, that the
16 business was sold to Phoenix Color, and that
17 any future business would have to go through
18 Phoenix Color Corporation. That's fact one, I
19 want you to think about.
20 Were you advised of that?
21 MR. WELLSCHLAGER: Can I hear
22 that fact one?
23 (Record read.)
24 Q. Were you advised about that?

**Page 102**

C. Corr

1 MR. GAUMONT: Let me have the
2 deposition. Do you have that?
3 MR. FRIEDMAN: No, page 35.
4 Q. Did you have an opportunity to
5 review Ms. Elizondo's deposition?
6 You are shaking your head yes?
7 A. Yes.
8 Q. So you have read it?
9 A. Yes.
10 Q. You may go back and consult with
11 it afterwards, but for purposes of this
12 question, let's assume that I characterized
13 her testimony, which is contained on page 35,
14 and I'm happy for you to go back and check it,
15 that's what she said about a conversation that
16 she had with Mr. Tiner shortly after the
17 purchase of TechniGraphix by Phoenix Color.
18 Fact two, also at pages 35, 36 of
19 Ms. Elizondo's deposition, Ms. Elizondo
20 testified that approximately a month later,
21 she had an in-person meeting with Mr. Tiner
22 and Mr. Tyler.
23 She believes also present with
24 her were a gentleman by the name of Ed Buxcon

**Page 103**

C. Corr

1 at Xerox in their sales department below her,
2 maybe also Mr. Nussbaum, but she is not sure.
3 MR. GAUMONT: Objection.
4 Q. She testified at her deposition,
5 pages 35, 36 as follows:
6 "Mr. Jack Tiner introduced Mr.
7 Tyler at this meeting as, quote, our
8 decision-maker, end quote, and further
9 as, quote, one who would be making all
10 operational decisions, end quote."
11 A. Yes.
12 Q. That's fact two.
13 A. Yes.
14 MR. GAUMONT: Mr. Friedman, since
15 you didn't bring the deposition, can I
16 ask, is that the meeting that occurred
17 at the TechniGraphix plant in Sterling,
18 Virginia?
19 MR. FRIEDMAN: I presume, yes.
20 MR. GAUMONT: Okay.
21 Q. Also, at that meeting in March of
22 1999 --
23 A. The one that you referenced
24 previously, which is that same meeting?

**Page 104**

C. Corr

1 Q. Yes.
2 A. That would have been a month
3 after, right?
4 Q. I'm sorry, yes, a month -- well,
5 it is in March, it is a month after the
6 purchase.
7 A. Okay. I just wanted to make
8 sure.
9 Q. The statements that Mr. Tyler --
10 excuse me, the statements of Mr. Tiner, Jack
11 Tiner, made regarding the status of Mr. Tyler
12 were made in the presence of Mr. Tyler. Those
13 comments that Mr. Tiner made and I will repeat
14 them --
15 A. We are with Mr. Tyler and Mr.
16 Tiner in the same room, is that what you are
17 saying?
18 Q. That's correct. It would be no
19 difference than all of them sitting around
20 this table having a meeting. It may have been
21 at the table. It may have been in a lunch.
22 A. It certainly wasn't in Don's
23 office.
24 Q. Right. At that meeting, assume

Charles Corr
September 18, 2003

### Page 105

```
 1              C. Corr
 2   an additional fact, that Mr. Tyler confirmed
 3   that he was the decision-maker and the person
 4   making operational decisions, that's what Ms.
 5   Elizondo testified in her deposition at page
 6   37.
 7          MR. GAUMONT: Objection.
 8       A.  Yes.
 9       Q.  Mr. Tyler, at that same meeting
10   where all these people were present, gave out
11   his business card, which was a Phoenix Color
12   Corporation business card to Ms. Elizondo and
13   to Mr. Armando Garcia.
14       A.  Yes.
15       Q.  It was Mr. Armando Garcia who
16   remembers receiving it.
17           Have you seen his business card,
18   by the way?
19       A.  I have, I remember reading the
20   deposition about this. I don't recall seeing
21   his business card.
22       Q.  I will show it to you in a
23   second. I didn't bring his card. It is too
24   valuable.
25          MR. GAUMONT: It is your entire
```

### Page 106

```
 1              C. Corr
 2   case.
 3          MR. FRIEDMAN: It is a good
 4   piece. Let's have that marked, his
 5   business card as exhibit next.
 6          (Copy of business card of Donald
 7          Tyler marked Corr Exhibit 4 for
 8          identification, as of this date.)
 9       Q.  Let me show you what's been
10   marked as Exhibit 4. It is the business card
11   that Mr. Don Tyler -- I get the names mixed
12   up.
13       A.  Yes, they are too close.
14       Q.  Why don't you read that for us,
15   what does it say?
16       A.  Phoenix Color Corporation, Donald
17   Tyler, Vice President Quality Service
18   Management, Extension 4516, and then it has
19   the address of the Hagerstown location.
20           Do you want me to read that?
21       Q.  No.
22       A.  And it looks like his e-mail
23   address as well, his phone number and his fax.
24       Q.  Ms. Elizondo has testified at her
25   deposition, page 71, that she saw Mr. Tyler
```

### Page 107

```
 1              C. Corr
 2   give out that business card to other people at
 3   the meeting, which would stand to reason. She
 4   said everybody exchanged business cards.
 5           Ms. Elizondo has also testified
 6   at her deposition on page 39 that Mr. Tyler,
 7   Donald Tyler, never said during that meeting
 8   that he was an employee of TechniGraphix.
 9           Those are the facts that I want
10   you to keep in mind.
11           In addition to that, there has
12   been deposition testimony provided by Armando
13   Garcia, another Xerox employee, who said that
14   he was at a meeting with Mr. Tyler, Donald
15   Tyler -- now, I'm not clear and I don't want
16   to misrepresent, I will tell you I'm not clear
17   whether he was at this March meeting which we
18   just described with Ms. Elizondo or some other
19   meeting, but he was at a meeting at which Mr.
20   Tyler gave out this business card, which we
21   marked as Exhibit 4.
22           And I will tell you it was Mr.
23   Garcia who retained it because he has a habit
24   of keeping all business cards.
25           Mr. Garcia also testified at his
```

### Page 108

```
 1              C. Corr
 2   deposition, page 31, that he understood Don
 3   Tyler was a Phoenix Color employee, that he
 4   presented himself as such, that he was the
 5   person who was integrating Tech into PCC,
 6   Phoenix Color Corporation, and he visited Mr.
 7   Tyler at his office, business office in
 8   Hagerstown, Maryland.
 9           Now, based upon the facts which I
10   just presented to you, did Xerox conduct --
11   strike that -- was Xerox justified in relying
12   upon Mr. Tyler's representation that he was a
13   vice president of Phoenix Color Corporation?
14          MR. GAUMONT: I have a number of
15          objections.
16           First, I object to the fact you
17   are recounting deposition testimony we
18   don't have in front of us because I
19   think you do mischaracterize it.
20           Second, I object to the hearsay
21   statements that Ms. Elizondo said that
22   Mr. Tiner said because, as you know, we
23   have no opportunity to cross-examine
24   Mr. Tiner.
25           My recollection of those
```

27 (Pages 105 to 108)

**Page 109**

```
                    C. Corr
 1
 2    depositions is that neither Ms.
 3    Elizondo nor Mr. Garcia had any
 4    personal knowledge of any discussions
 5    with Tyler concerning what he
 6    represented and I think the deposition
 7    does reflect that.
 8        In addition, both of them were
 9    very unclear as to where and when this
10    business card was allegedly given to
11    them, particularly Ms. Elizondo, I
12    remember, was unsure as to when this
13    business card was given to her.
14        So with those objections in mind,
15    I don't have a problem with the witness
16    trying to answer this hypothetical.
17    Q.    I just want you to assume the
18    facts that I gave you as being within the
19    realm of information that was provided to
20    Xerox employees in the time frame of March
21    1999 --
22    A.    Yes.
23    Q.    -- when making a determination as
24    to whether or not Mr. Tyler was the
25    appropriate person to deal with and what his
```

**Page 110**

```
                    C. Corr
 1
 2    status was.
 3        MR. GAUMONT: Objection. That is
 4        compound. They are two entirely
 5        different questions, who to deal with
 6        as a representative of TechniGraphix is
 7        different from his status.
 8        MR. FRIEDMAN: That is fine. We
 9        will take it one at a time.
10    Q.    His status, first off.
11    A.    I would not rely on nor would I
12    advise any of my clients to solely rely on
13    someone's characterization of their own
14    authority and, you know, where they sat within
15    an organization.
16    Q.    Someone's own, you mean Mr.
17    Tyler?
18    A.    Yes. In other words, just
19    because one may say they hold a position does
20    not necessarily mean that they have the
21    authority that you may wish them to have to
22    execute an agreement. In other words --
23    Q.    If it is corroborated by a Mr.
24    Jack Tiner, who introduced Mr. Tyler to the
25    Xerox people, would that --
```

**Page 111**

```
                    C. Corr
 1
 2        MR. GAUMONT: Objection.
 3    Q.    Would that --
 4    A.    What do you mean, as introduced
 5    as?
 6        MR. GAUMONT: Objection.
 7    Q.    -- would that be additional
 8    corroboration for Xerox to rely upon?
 9        MR. GAUMONT: Objection.
10    Hearsay.
11    A.    Due diligence would require that
12    you check this out. I mean, if you are going
13    to a bank or if you even look at Xerox
14    Corporation, the title of vice president in
15    and of itself means relatively little.
16        And as you described, he was
17    responsible for, I think you said operational
18    details. As we discussed earlier, these are
19    operation -- some of this is what I would call
20    operational detail, here move this in, move
21    that out.
22        So is it reasonable to assume
23    that, for operational details, he was the
24    go-to guy? I would imagine, yeah, I would say
25    it was reasonable to assume that.
```

**Page 112**

```
                    C. Corr
 1
 2        As to his decision-making
 3    authority, that, I think, you know, would
 4    require a little more diligence than just the
 5    fact that a couple of people, you know, handed
 6    out a card that, frankly, says -- doesn't
 7    speak to this particular assignment, so which
 8    would lead me to believe it might be, people's
 9    titles and responsibilities change regularly.
10        I often have cards that people
11    hand me and say I haven't had a chance to
12    change it, here is my last card. They don't
13    often reflect current state.
14    Q.    Wouldn't it have been appropriate
15    for Mr. Tyler if, in fact, that was not -- not
16    his current state, what is reflected on the
17    business card marked as Exhibit 4, to have
18    made that statement?
19        MR. GAUMONT: Objection.
20    A.    I don't know that he didn't.
21    Q.    Well, would it have been
22    appropriate -- would it have been appropriate
23    for Mr. Tyler at some point subsequent to
24    March 1999 to have obtained the business card
25    which indicated his actual status with
```

```
                     C. Corr
 1
 2   TechniGraphix as opposed to Phoenix Color?
 3         MR. GAUMONT: Objection.
 4      Q.   Wouldn't it have been
 5   appropriate?
 6      A.   It is my experience that people
 7   often don't have the business card with their
 8   existing job.
 9      Q.   You mean they go through their
10   entire existence within a business role
11   without having the business card; that is your
12   experience?
13      A.   Quite often, yes.
14      Q.   Is that a good business practice,
15   in your opinion?
16         MR. GAUMONT: Objection.
17      A.   I think it is reflective of many
18   ways of today's business climate.
19      Q.   Is that a good business practice,
20   in your opinion?
21         MR. GAUMONT: Objection.
22      A.   I don't think it is egregious.
23      Q.   Do you do that?
24      A.   I'm sure that we have done it
25   because we haven't caught up with changes in
                                          Page 113
```

```
                     C. Corr
 1
 2   our business cards.
 3      Q.   Would it be appropriate for you
 4   not to have a current business card nine
 5   months later?
 6         MR. GAUMONT: Objection.
 7      A.   No. But it wouldn't be unusual.
 8      Q.   Would it be appropriate for you
 9   not to have a current business card six months
10   later?
11      A.   Again, but not unusual.
12      Q.   So the answer is, yes, it would
13   be inappropriate, but not unusual, from your
14   experience, is that what you are telling me?
15      A.   That's what I'm telling you, yes.
16      Q.   If, in fact, you didn't have an
17   appropriate business card, wouldn't you, as an
18   honest business person, indicate to the
19   individual you are handing it to, this is not
20   my proper business card, whoops, I haven't
21   gotten a new one made up yet?
22      A.   That's fairly common, if it is
23   not the right card, that someone would mention
24   that it was not current.
25      Q.   TechniGraphix has testified
                                          Page 114
```

```
                     C. Corr
 1
 2   through Mr. Lieberman and Mr. Tyler that they
 3   never obtained or produced a business card in
 4   the name of TechniGraphix for Mr. Tyler.
 5      Are you aware of that?
 6         MR. GAUMONT: Objection. That is
 7   a mischaracterization of testimony. At
 8   the time of deposition, they were
 9   unsure whether the business card was
10   obtained and we subsequently produced a
11   business card to you in discovery.
12         MR. FRIEDMAN: You produced a
13   business card showing his -- I haven't
14   seen it. When did you produce it?
15         MR. GAUMONT: Months ago.
16         MR. FRIEDMAN: What does it say?
17         MR. GAUMONT: It says -- I did
18   not bring it with me. I'm not
19   testifying here. You have an
20   obligation to review your own
21   discovery, Sidney.
22         MR. FRIEDMAN: Your testimony is
23   you sent us a business card from
24   TechniGraphix showing that there was a
25   business card produced for him with his
                                          Page 115
```

```
                     C. Corr
 1
 2   title on it?
 3         MR. GAUMONT: I'm not testifying.
 4   We can discuss this later.
 5         MR. FRIEDMAN: We will go off the
 6   record.
 7         (Discussion held off the record.)
 8         MR. FRIEDMAN: For the record,
 9   Mr. Gaumont says that he sent us a copy
10   of a business card from Mr. -- from the
11   defendant showing that Mr. Tiner did
12   actually produce a business card with
13   his status, I have not seen it, I will
14   take his representation as accurate.
15   If I am wrong about that, I will
16   apologize.
17         MR. GAUMONT: Mr. Friedman meant
18   Mr. Tyler.
19      Q.   Mr. Tyler.
20      So it is your testimony, your
21   opinion, that Xerox should have done what, in
22   addition to the information they acquired
23   regarding the status of Mr. Tyler's position
24   with --
25      A.   What I would advise them to do or
                                          Page 116
```

29 (Pages 113 to 116)

(212) 268-2590                                    E-Mail: ClassReptg@aol.com
                         CLASSIC REPORTING, INC.

Charles Corr
September 18, 2003

**Page 117**

```
1            C. Corr
2  my experience would be that you would
3  determine the authority that someone has and
4  that if, indeed, this characterization is
5  correct, which I would imagine would be, you
6  know, reinforced by the fact that that is
7  where he -- I don't know if you have ever been
8  to the plant.
9       Q.  No, I haven't.
10      A.  He had a very small office near
11 the production facility.  So it would make
12 sense that he was responsible for, you know,
13 the operational issues.  It would not make
14 sense that he would be able to bind or --
15 bind, you know, separate entities.
16      Q.  Would it have been appropriate
17 for Phoenix Color to have put out a press
18 release to its -- to the world or sent a
19 letter out to its customers and vendors that
20 Mr. Tyler is no longer with Phoenix Color as a
21 vice president, he is now with TechniGraphix
22 and in whatever status or capacity he is in,
23 would that have been appropriate business
24 practice?
25      MR. GAUMONT:  Objection.
```

**Page 118**

```
1            C. Corr
2       A.  My sense he is not senior enough
3  that he would ever issue a press release
4  about --
5       Q.  I didn't say him.  Wouldn't it
6  have been appropriate for someone on behalf of
7  TechniGraphix to have done that, or Phoenix
8  Color, so that the world would understand his
9  status?
10      MR. GAUMONT:  Objection.
11      A.  And discuss the status -- we do
12 this stuff all the time.  It would be very
13 rare.  When I say very rare, I cannot think of
14 an occasion where you would discuss someone's
15 position in an organization that would be as
16 low as this gentleman's position appears to
17 be.
18          Is it often the case that you
19 would issue a press release around a merger or
20 an action on the acquisition of stock?
21 Certainly, it is very common for publicly held
22 companies to do that.  It is less common for
23 privately held companies to do that.
24          And in my opinion, is that it is
25 generally related to the marketing impact,
```

**Page 119**

```
1            C. Corr
2  general, the issuance of press releases is not
3  so much to have people better understand the
4  business part of it as it is to position them
5  within the marketplace.
6       Q.  If Mr. Tyler was inappropriately
7  signing contracts as vice president of Phoenix
8  Color because, in fact, he didn't have that
9  status, what checks and balances should have
10 been in place to have caught that --
11      MR. GAUMONT:  Objection.
12      Q.  -- error on the part of Phoenix
13 Color --
14      MR. GAUMONT:  Objection.
15      Q.  -- and then secondarily, on the
16 part of TechniGraphix?
17      MR. GAUMONT:  Objection.
18      A.  What would I advise them to do?
19      Q.  Yes, what would you have advised
20 them to do to make sure that appropriate
21 people were signing contracts?
22      MR. GAUMONT:  Objection.
23      A.  You would certainly have -- I
24 mean, an appropriate way, whether they have
25 this or not, I have no knowledge, that you had
```

**Page 120**

```
1            C. Corr
2  your own policies and procedures in place to
3  both collect and -- I mean, you would have
4  your own accounting system that would also be
5  in place, issue purchase orders in addition to
6  signing agreements.
7       Q.  So at some point, there could
8  have been a system in place which would have
9  caught the fact that Mr. Tyler was signing
10 contracts inappropriately as vice president of
11 Phoenix Color; is that correct?
12      MR. GAUMONT:  Objection.
13      Mischaracterization.
14      A.  You asked the question could
15 there have been?  Could there have been?  Yes.
16 To my knowledge, I have no knowledge of that.
17      Q.  Did you inquire of Phoenix Color
18 whether they had such systems in place?
19      A.  I did not.
20      Q.  Have you made any such inquiry as
21 to whether they had such systems in place?
22      A.  Actually, I have.
23      Q.  What was the result, the
24 response?
25      A.  I don't have a clear
```

30 (Pages 117 to 120)

Charles Corr
September 18, 2003

**Page 121**

```
 1              C. Corr
 2  understanding of any of their internal
 3  processes as it would relate to that issue.
 4      Q.  Why is that?
 5      A.  I'm speculating as to why.  I
 6  don't know why.
 7      Q.  No, I meant why is it you don't
 8  have a clear understanding?
 9      A.  I'm speculating as to why I don't
10  have -- I do not have a clear understanding.
11  It has not been fully explained to me.
12      Q.  By Phoenix Color?
13      A.  Right.
14      Q.  Did you make the same such
15  inquiry with regard to TechniGraphix?
16      A.  My inquiry would have included
17  both parties.
18      Q.  And the answer is the same as to
19  both Phoenix Color and TechniGraphix?
20      A.  Yes.
21      Q.  That neither one has been able to
22  explain to you why they didn't have some sort
23  of procedure and system in place to have
24  caught up with this problem of Mr. Tyler
25  signing --
```

**Page 122**

```
 1              C. Corr
 2          MR. GAUMONT:  Objection.
 3      A.  It wasn't related directly to
 4  this.  It was related right from the beginning
 5  of what -- in other words, if you think back
 6  to the initial conversation I had with Bob,
 7  part of it was, what do you have, right?  What
 8  information do you have?  What pieces of paper
 9  do you have, and then subsequently, it is
10  what -- what was the process.
11      Q.  Then I take it, you haven't
12  gone -- have you gone back to make further
13  inquiries regarding this problem --
14          MR. GAUMONT:  Objection.
15      Q.  -- subsequent to your initial
16  inquiry?
17          MR. GAUMONT:  Objection.
18      Q.  I guess the answer is no because
19  you can't tell me today, right?
20      A.  I certainly -- it perhaps is
21  discussed.  I don't remember.  I don't recall.
22      Q.  You think you may have discussed
23  it, but sitting here today, your testimony is
24  that you still don't know why those systems
25  weren't in place; is that a fair statement?
```

**Page 123**

```
 1              C. Corr
 2          MR. GAUMONT:  Objection.
 3      A.  That's fair.
 4      Q.  All right?
 5      A.  It is also fair that was more my
 6  inquisitiveness, not that it was necessarily a
 7  key to my being able to evaluate it, it was
 8  just sort of, what's there.
 9          MR. GAUMONT:  Is now an okay time
10  for a short break?
11          MR. FRIEDMAN:  Yes, I'm sorry.
12          (Recess taken.)
13      Q.  Looking at Exhibit 1, your first
14  report, the second page, the last paragraph,
15  you say:
16          "It is our belief to a reasonable
17      degree and professional certainty that
18      late in 2000 Xerox could have sold this
19      equipment as used."
20      A.  Yes.
21      Q.  At what price?
22      A.  My belief is that they could have
23  used it at very close to the price of new
24  equipment, which, depending upon the
25  configuration, puts it in the upper, you know,
```

(212) 268-2590   E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.

**Page 137**

```
 1            C. Corr
 2   FURTHER EXAMINATION
 3   BY MR. FRIEDMAN:
 4       Q.   Would your answer to Mr.
 5   Gaumont's questions be different if you were
 6   looking at a contract that was not a
 7   modification and signed by Mr. Tyler in his
 8   position as vice president of Phoenix Color?
 9            MR. FRIEDMAN: Let me show you a
10       document and let's have that marked as
11       Exhibit 5, please.
12            (Xerox Corporation document
13             entitled "Sale/Maintenance
14             Agreement" marked Corr Exhibit 5
15             for identification, as of this
16             date.)
17            MR. GAUMONT: Well, hold on a
18       second. This is a contract in the name
19       of TechniGraphix.
20       Q.   Would your answer be any
21   different after reviewing what's been marked
22   as Exhibit 5?
23            How did Mr. Tyler sign that
24   contract on the bottom?
25            MR. GAUMONT: Objection.
```

**Page 138**

```
 1            C. Corr
 2       Compound. Which question do you want
 3       him to answer?
 4       Q.   First, how did he sign it?
 5       A.   As --
 6            MR. GAUMONT: Well, objection to
 7       the characterization.
 8       Q.   How is it signed, what is the
 9   representation?
10            MR. GAUMONT: Objection. You are
11       implying that the representation was
12       made by Mr. Tyler. The undisputed
13       testimony is that --
14       Q.   How did he sign it?
15       A.   He signed it, there is his name,
16   there is his signature.
17       Q.   Correct. He signed it -- would
18   you agree with me that he signed it under the
19   designation Donald Tyler, Vice President,
20   Phoenix Color?
21       A.   Yeah, he clearly signed it, to
22   the best of my knowledge, that's his
23   signature.
24       Q.   Right.
25       A.   And the other --
```

**Page 139**

```
 1            C. Corr
 2       Q.   Would your answer be different,
 3   having seen that contract, which is not a
 4   modification, does that change your opinion in
 5   any way?
 6       A.   No.
 7            MR. GAUMONT: Objection.
 8       Q.   Why?
 9       A.   It is still, in my mind, an
10   operational issue within TechniGraphix.
11       Q.   Why?
12       A.   Because it is on a Docusheeter,
13   not a 6180.
14       Q.   Is that a new piece of equipment?
15       A.   No, it is an accessory.
16       Q.   It is not a modification, does it
17   say modification on that document?
18       A.   No.
19       Q.   Exhibit 5 doesn't say
20   modification, does it?
21       A.   It does not.
22       Q.   In fact, it is adding a piece of
23   equipment, a Docusheeter?
24       A.   Yes.
25       Q.   And, in fact, it is signed by
```

**Page 140**

```
 1            C. Corr
 2   Donald Tyler under the designation vice
 3   president, Phoenix Color?
 4       A.   Yes.
 5       Q.   And, in fact, do you agree with
 6   me that it says at the top under the
 7   customer's name, "TechniGraphix, a wholly
 8   owned subsidiary of Phoenix Color
 9   Corporation"?
10            If you looked at that designation
11   in and of itself, what would that tell you
12   about the status of TechniGraphix?
13            MR. GAUMONT: Objection. It
14       calls for a legal conclusion.
15       Q.   In your business experience,
16   would that indicate to you that TechniGraphix
17   was a separate corporation?
18            MR. GAUMONT: Objection.
19            MR. WELLSCHLAGER: It couldn't be
20       clearer.
21       Q.   Is there anything in that
22   document that says TechniGraphix is a separate
23   corporation?
24       A.   Yes. It says --
25       Q.   Show me. What's it say? Read me
```

35 (Pages 137 to 140)

(212) 268-2590                                    E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.

**Page 141**

```
 1            C. Corr
 2  the words that tell you it is a corporation.
 3         MR. WELLSCHLAGER: How about
 4     subsidiary?
 5     A.   A wholly owned subsidiary.
 6     Q.   So if the words after the
 7  designation, after the name say "wholly owned
 8  subsidiary," it automatically means to you,
 9  based upon your experience, that it is a
10  corporation?
11         MR. GAUMONT: Objection.
12     Q.   "It," meaning TechniGraphix?
13     A.   I'm going to qualify my answer
14  back to you. If you were to present this to
15  me --
16     Q.   Yes?
17     A.   -- I would immediately conclude
18  or be concerned that there was a separate
19  corporate entity going on between the two
20  pieces, TechniGraphix and Phoenix Color.
21         I would be immediately concerned
22  about that differentiation because, in many
23  cases, people structure themselves to be
24  corporately distinct for a variety of reasons,
25  and we could argue this, but I would argue in
```

**Page 142**

```
 1            C. Corr
 2  most cases, to keep some distance between
 3  parent companies and subsidiaries, and I would
 4  be very nervous about the ability to -- to
 5  bind one to the other and would want to
 6  understand that.
 7     Q.   That's based upon your
 8  experience. And I would tell you that I would
 9  have the same type of inquiry because I'm a
10  trained lawyer.
11         Would the average layman make
12  such an inquiry, have such doubts in their
13  mind, in your opinion?
14         MR. GAUMONT: Objection.
15         Objection. He is not testifying as to
16     the average layman.
17     Q.   Would a salesman have such
18  doubts, who is not as trained as you or me?
19         MR. GAUMONT: Objection.
20     A.   Well, in doing sales training, we
21  would point out that you want to be very
22  careful about and target what we call sea
23  level folks within an organization so that you
24  overcome some of these things and you are sure
25  you are working with the right level of
```

**Page 143**

```
 1            C. Corr
 2  decision-maker.
 3     Q.   It is highly unlikely, in your
 4  sales training, that you would have
 5  encountered a situation like this; isn't that
 6  true?
 7         MR. GAUMONT: Objection.
 8     Q.   And that you would have focused
 9  your audience on that particular problem?
10         MR. GAUMONT: Objection.
11     Q.   Yes or no?
12     A.   Well, I'm just trying to qualify
13  the particular problem.
14     Q.   The particular problem being
15  understanding what a subsidiary is.
16         Do you actually conduct seminars
17  with salespeople which focuses on --
18     A.   No.
19     Q.   -- what -- the answer is no?
20     A.   The answer to that question is
21  no. We do focus on who you should target.
22     Q.   Slower, as a general matter, but
23  not specifically as to subsidiaries, right?
24  Yes or no?
25     A.   It is a broad question. Not
```

**Page 144**

```
 1            C. Corr
 2  specifically the way you have described it,
 3  but it is something that you would want them
 4  to be concerned about, which is why you urge
 5  them to deal with people with the right level
 6  within an organization.
 7     Q.   Right. But you don't
 8  specifically deal with that type of a problem
 9  where it is written in the form of a
10  subsidiary of and say to your audience, you
11  know, a subsidiary means that you are a
12  corporation?
13         MR. GAUMONT: Objection.
14     Q.   Have you ever given a seminar
15  like that? Yes or no?
16         MR. GAUMONT: Objection. Asked
17     and answered.
18     A.   No.
19     Q.   Thank you.
20         MR. FRIEDMAN: Let's have this
21     marked.
22         (Handwritten note dated January
23     6, 2000 from Donald Tyler to
24     Bruce Nussbaum marked Corr
25     Exhibit 6 for identification, as
```

36 (Pages 141 to 144)

(212) 268-2590                    E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.

## Page 145

```
 1          C. Corr
 2   of this date.)
 3       Q.  Exhibit 6 is a letter, it is an
 4   original from Donald Tyler to Bruce Nussbaum
 5   written on January 6, 2000.
 6          How did Mr. Tyler sign off on
 7   that letter?
 8          MR. GAUMONT:  Objection.
 9       Relevance.  This was executed after the
10       December '99 modifications, but you can
11       answer.
12       A.  How did he sign it?
13       Q.  Yes.
14       A.  VP operations for TechniGraphix.
15       Q.  Division of Phoenix Color
16   Corporation?
17       A.  Yes.
18          MR. GAUMONT:  Let me note for the
19       record was what he signed was Donald
20       Tyler, VP operations.  There is
21       TechniGraphix stationery that he signed
22       it on, which indicates division of
23       Phoenix Color Corp.
24       Q.  If you are getting that letter,
25   could you conclude that Mr. Tyler is a vice
```

## Page 146

```
 1          C. Corr
 2   president of Phoenix Color Corporation?
 3          Is that a possible inference to
 4   draw from that?
 5          MR. GAUMONT:  Objection.
 6       Anything is possible.
 7          MR. FRIEDMAN:  Yes, it is.
 8       A.  It is not an inference I would
 9   necessarily draw from it.
10       Q.  All right.  Is it an inference
11   that a salesperson who is not as trained as
12   you or I could draw, or would draw?
13       A.  Rephrase.  Could draw?  I mean,
14   again, I'm back on anything is possible.
15          MR. GAUMONT:  Yes.  Objection.
16       Q.  All right.  Would a salesman draw
17   such an inference from that letter?
18          MR. GAUMONT:  Objection.
19          MR. WELLSCHLAGER:  Sidney, he
20       can't testify about what a salesman --
21       ask him if it is a reasonable or fair
22       inference.
23          MR. FRIEDMAN:  Thank you.
24       Q.  Is it a reasonable or fair
25   inference for a salesman to draw from that
```

## Page 147

```
 1          C. Corr
 2   letter that Mr. Tyler is the vice president of
 3   Phoenix Color Corporation?
 4          MR. GAUMONT:  Objection.
 5       A.  No, I would read it he is the
 6   vice president of TechniGraphix.
 7       Q.  So your testimony is that it
 8   would not be a reasonable inference for a
 9   salesman to draw that?
10       A.  That would be my opinion, yeah.
11       Q.  And that is based upon the fact
12   that --
13       A.  TechniGraphix --
14       Q.  In your opinion, if you use the
15   word "a division," it automatically means that
16   it is a separate corporation?
17          That's what I want to understand.
18          MR. GAUMONT:  Objection.
19       A.  It would indicate to me he is a
20   vice president of TechniGraphix, that's
21   what -- he just signed it, that is the
22   letterhead.
23       Q.  What is the purpose of putting on
24   there a division of Phoenix Color Corporation,
25   what business purpose does that serve --
```

## Page 148

```
 1          C. Corr
 2          MR. GAUMONT:  Objection.
 3       Q.  -- in your opinion?
 4       A.  Just, again, why people, you
 5   know, carry -- it is generally my opinion that
 6   those are usually branding issues and if you
 7   think about, for instance, CAP Ventures
 8   acquired a company Info Trends.
 9       Q.  Branding issues -- I don't mean
10   to cut you off, but we are sort of running out
11   of time -- by that, you mean that they want
12   the party receiving that information to know
13   that they are associated with this other
14   entity.
15          MR. GAUMONT:  Objection.
16       Q.  Is that correct?
17       A.  Generally, that is correct.
18   Because, as I indicated earlier, generally
19   driven from a marketing and sales perspective,
20   not a notification perspective.
21       Q.  Well, what benefit does
22   TechniGraphix get, in your opinion, out of
23   utilization of that terminology, a division of
24   Phoenix Color Corporation?  Why not just say
25   TechniGraphix, Inc?
```

37 (Pages 145 to 148)

(212) 268-2590                                   E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.

**Page 149**

```
 1            C. Corr
 2      MR. GAUMONT: Objection.
 3    Q.   As a business practice, what
 4  benefit do they get out of that?
 5    A.   Phoenix has a stronger brand.
 6    Q.   Does Phoenix -- and would it be
 7  true that they might derive the benefit of
 8  Phoenix's stronger financial statement --
 9      MR. GAUMONT: Objection.
10    Q.   -- for resources?
11      MR. GAUMONT: Calls for
12    speculation.
13    Q.   -- for financial resources?
14      MR. GAUMONT: Objection. Calls
15    for speculation.
16    A.   Whether that were true or not,
17  certainly financial stability has something to
18  do with brand, plus or minus, but beyond that,
19  I don't know.
20      MR. FRIEDMAN: I'm going to
21    conclude and I know you may have some
22    follow up based on what I just said.
23    If you don't, fine.
24      I would like to have these
25    exhibits photocopied.  I would like to
```

**Page 150**

```
 1            C. Corr
 2    take the originals back with me.
 3      Did you have anything else.
 4      MR. GAUMONT: No.
 5      (Recess taken.)
 6      MR. FRIEDMAN: Back on the
 7    record, by agreement of all here today,
 8    we are stopping the deposition at this
 9    point because of Hurricane Isabel,
10    which is making its way north.
11      And because of my fear that I'm
12    not going to be able to get on the 2
13    o'clock train and everybody has
14    graciously agreed to allow us to
15    continue this at a later date, we will
16    decide whether it will be by telephone,
17    when, where and so.
18      Is that a fair statement?
19      (Transcript continued on next
20    page)
```

**Page 151**

```
 1            C. Corr
 2      MR. GAUMONT: That's a fair
 3    statement, mutually convenient time and
 4    special consideration given to Mr.
 5    Corr's time.
 6      MR. FRIEDMAN: Absolutely. I
 7    will bend my schedule for Mr. Corr.
 8      (Time noted: 12:43 P.M.)
 9    _____
10    Charles M. Corr
11
12  Subscribed and sworn to
13  before me this_____day
14  of_____2003.
15  _____
```

**Page 152**

CERTIFICATE
-----------

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NEW YORK )

I, ANNELIESE R. TURSI, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That I reported the proceedings in the within-entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this __25th__ day of September, 2003.

_____
ANNELIESE R. TURSI, RPR

38 (Pages 149 to 152)

(212) 268-2590            E-Mail: ClassReptg@aol.com
CLASSIC REPORTING, INC.